# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 14, 2011   Decided February 28, 2012

No. 10-7174

MCKESSON CORPORATION, ET AL.,
APPELLEES

v.

ISLAMIC REPUBLIC OF IRAN,
APPELLANT

FINANCIAL ORGANIZATION FOR THE EXPANSION OF
OWNERSHIP OF PRODUCTIVE UNITS, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:82-cv-00220)

———

*Christopher J. Wright* argued the cause for appellant. On the briefs were *Thomas G. Corcoran Jr.*, *Laina C. Wilk Lopez*, and *Henry M. Lloyd*.

*Mark N. Bravin* argued the cause for appellees McKesson Corporation, et al. With him on the briefs was *Mark R. Joelson*. *David M. Kerr* entered an appearance.

*H. Thomas Byron*, *III*, Attorney, U.S. Department of Justice, argued the cause as *amicus curiae* United States. With him on the brief were *Tony West*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, *Douglas N. Letter*, Attorney, and *Harold Hongju Koh*, Legal Adviser, U.S. Department of State.

Before: SENTELLE, *Chief Judge*, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge:* This decades-long dispute boils down to a rather simple set of allegations: McKesson Corporation, a U.S. company, claims that after the Islamic Revolution, the government of Iran expropriated McKesson's interest in an Iranian dairy and withheld its dividend payments. McKesson filed its complaint in 1982, and the procedural nightmare that followed resembles the harshest caricature of the American litigation system as one in which justice can be continually delayed, if not denied. This case has reached our Court on five prior occasions, and we have remanded it for numerous trials by the district court. Yet after almost thirty years of effort, this litigation has yet to definitively address the foundational issues of this case— namely, whether this Court has jurisdiction over McKesson's claim and whether any recognized body of law provides McKesson with a private right of action against Iran.

## I. Background

The facts of this case are set forth fully in earlier decisions. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 440–42 (D.C. Cir. 1990) ("*McKesson I*"); *McKesson Corp v. Islamic Republic of Iran,* 52 F.3d 346,

347–49 (D.C. Cir. 1995) (*"McKesson II"*); *McKesson HBOC, Inc. v. Islamic Republic of Iran,* 271 F.3d 1101, 1104–05 (D.C. Cir. 2001) (*"McKesson III"*). Sherkat Sahami Labaniat Pasteurize Pak ("Pak Dairy"), a joint venture between McKesson and private Iranian citizens, was incorporated on March 12, 1960. McKesson's ownership interest in Pak, initially 50 percent, had decreased to 31 percent at the time of the Islamic Revolution. McKesson alleges that in the wake of the Revolution, agents and instrumentalities of the government of Iran seized control of the board of directors of Pak. Through a series of hostile actions allegedly instigated by the government, the board effectively froze out McKesson's stake in Pak and blocked McKesson's receipt of dividend payments. In 1982, McKesson, joined by the Overseas Private Investment Corporation ("OPIC"), filed suit in the United States District Court for the District of Columbia, alleging that Iran had unlawfully expropriated its property without compensation.

Pursuant to Executive Order 12,294, 46 Fed. Reg. 14,111 (Feb. 24, 1981), the case was stayed while the plaintiffs presented their claims to the Iran-United States Claims Tribunal ("Tribunal"). From McKesson's perspective, the Tribunal rendered a mixed result. Although the Tribunal held that interference with McKesson's rights had not amounted to an expropriation by the last date of the Tribunal's jurisdiction, it did rule that Pak Dairy had unlawfully withheld from McKesson cash dividends declared in 1979 and 1980. *See Foremost Tehran, Inc. v. Islamic Republic of Iran,* 10 Iran-U.S. Cl. Trib. Rep. 228, 1986 WL 424309 (1986) ("Tribunal Award"). The Tribunal also found that Pak Dairy was a corporation controlled by the Government of Iran, and accordingly awarded McKesson $1.4 million in damages, which included interest on its withheld dividends. According to the provisions of the Algiers Accords, Iran paid the

amounts awarded out of a security account established at the Hague.

Although the Tribunal award was substantial, it did not fully compensate McKesson for the ongoing expropriation of its interest in Pak. In an attempt to recover the value of that interest, McKesson revived this suit in April 1988 in the district court. Iran filed a motion to dismiss, claiming that it was immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1605, but the district court held that McKesson had properly pleaded jurisdiction under the commercial activities exception of the FSIA. *Foremost McKesson, Inc. v. Islamic Republic of Iran,* No. 82-0220, 1989 WL 44086, at *4 (D.D.C. Apr. 18, 1989) ("*McKesson 1989*"). On appeal, this Court remanded for further development of the record regarding whether Pak's board of directors was an agency or instrumentality controlled by the state for purposes of the stringent requirements of the FSIA. *McKesson I,* 905 F.2d at 440 (noting that under FSIA, "agencies and instrumentalities of a foreign nation are presumed to be separate from each other and from the foreign state"). On remand, the district court found that the evidence established the necessary principal-agent relationship between the Government of Iran and the board of directors of Pak, and this Court affirmed the "extensive" and "well-supported" findings of the district court. *McKesson II,* 52 F.3d at 351–52.

The district court subsequently granted McKesson's motion for summary judgment on the issue of liability, holding that, as a matter of law, Iran had wrongfully withheld from McKesson the payment of dividends declared by Pak Dairy in 1981 and 1982 and that Iran could be held liable in federal court for the expropriation and failure to pay dividends under the Treaty of Amity and customary

international law. *McKesson Corp. v. Islamic Republic of Iran,* No. 82-0220, 1997 WL 361177, at \*12–\*15 (D.D.C. June 23, 1997) (*"McKesson 1997"*). Between January 18 and February 17, 2000, the district court held a bench trial to determine the appropriate amount of damages. *McKesson Corp. v. Islamic Republic of Iran,* 116 F. Supp. 2d 13 (D.D.C. 2000) (*"McKesson 2000"*). The court awarded McKesson $20,071,159.14, which included the value of McKesson's expropriated equity interest in Pak and the dividends withheld from McKesson in 1981 and 1982, plus simple interest calculated at 9 percent from August 12, 1981 to May 26, 2000. *Id.* at 43.

On appeal, Iran again argued that the court lacked jurisdiction, and further claimed that (1) material issues of fact existed with respect to liability, and (2) the district court erred in valuing Pak's assets. We again affirmed jurisdiction under the FSIA and upheld the district court's conclusion that the 1955 Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran, Aug. 15, 1955, 8 U.S.T. 899 ("Treaty of Amity"), between the United States and Iran provided McKesson with a cause of action for expropriation. *McKesson III,* 271 F.3d at 1106–08. We also upheld the district court's valuation of Pak's assets. *Id.* at 1110. On the question of liability, however, Iran lived to fight another day, as we remanded the case for trial on two factual issues: whether Pak had instituted a so-called "come-to-the-company" requirement for the payment of dividends, and whether it would have been futile for McKesson to "come" to Pak to collect its dividends. *Id.* at 1108–10.

Iran immediately petitioned the Supreme Court for certiorari to review *McKesson III.* The Solicitor General took over representation of OPIC, which had previously retained private counsel, and advocated for the denial of certiorari on

grounds that the case was not ripe for review. In the course of its argument, however, the Solicitor General also made clear that the United States did not interpret the Treaty of Amity as providing a private right of action. Brief for the Overseas Private Investment Corporation, *Islamic Republic of Iran v. McKesson,* Nos. 01-1521 & 01-1708, 2002 WL 32134807, at *9–15 (July 24, 2002). The Supreme Court denied certiorari.

In light of the government's change of position, this Court vacated "the portion of [*McKesson III*] addressing whether the Treaty of Amity between the United States and Iran provides a cause of action to a United States national against Iran in a United States court," and instructed the district court "to reexamine that issue in light of the representation of the United States that it does not interpret the Treaty of Amity to create such a cause of action." *McKesson HBOC, Inc. v. Islamic Republic of Iran,* 320 F.3d 280, 281 (D.C. Cir. 2003) ("*McKesson IV*"). On remand, the district court essentially affirmed its earlier conclusion that the Treaty provides a cause of action, finding "no basis to disturb Judge Flannery's earlier ruling" in *McKesson 1997. McKesson Corp. v. Islamic Republic of Iran,* 520 F. Supp. 2d 38, 40 (D.D.C. 2007) ("*McKesson 2007*").

In our most recent encounter with this case, we reversed the district court's ruling that the Treaty of Amity provides McKesson with a private cause of action under United States law, noting that the Treaty "leaves open the critical question of *how* McKesson is to secure its due. For a federal court trying to decide whether to interject itself into international affairs, the Treaty of Amity's silence on this point makes all the difference." *McKesson Corp. v. Islamic Republic of Iran,* 539 F.3d 485, 489 (D.C. Cir. 2008) ("*McKesson V*"). In light of this conclusion, we again remanded the case and instructed the district court to consider three specific issues: (1) whether

McKesson has a cause of action under Iranian law; (2) whether, in light of the Supreme Court's decision in *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004), customary international law ("CIL") provides McKesson a cause of action; and (3) whether the act of state doctrine, which bars courts from evaluating public acts committed by foreign states within their own territory, applies to this case. We further ordered the district court to invite the views of the United States on the latter two issues. *McKesson 2008,* 539 F.3d at 491.

Upon review of the parties' submissions and the extensive record compiled during this case's 27-year history, the district court held that McKesson does have a cause of action under Iranian law, that customary international law continues to provide McKesson with a cause of action, even in light of *Sosa,* and that the act of state doctrine does not apply. *McKesson Corp. v. Islamic Republic of Iran,* No. 82-0220, 2009 WL 4250767, at *1 (D.D.C. Nov. 23, 2009) ("*McKesson 2009*"). Following that ruling, the parties submitted additional briefing on the merits of the Iranian law causes of action. After reviewing the parties' submissions and hearing arguments, the court entered judgment for McKesson on its Iranian law causes of action and awarded $43,980,205.58 in damages and prejudgment interest. *McKesson Corp. v. Islamic Republic of Iran,* 752 F. Supp. 2d 12, 23 (D.D.C. 2010) ("*McKesson 2010*"). Iran appeals.

In the interest of procedural fairness and judicial finality, we think this Sisyphean labor must come to an end. We conclude (1) the act of state doctrine does not preclude adjudication of this case; (2) McKesson has a private right of action against Iran under the Treaty of Amity as construed under Iranian law; and (3) Iran is liable for the expropriation of McKesson's interest in the dairy and the withholding of

McKesson's dividends. Finally, we reverse the district court's award of compound interest, as we find no evidence in the record supporting the conclusion that compound interest is a remedy recognized by Iranian law. Since Iran does not dispute this Court's prior finding that simple interest is appropriate, we remand only for the calculation of an award based on the value of McKesson's expropriated equity interest and withheld dividends, plus simple interest calculated at 9 percent from August 12, 1981 to the present day.

## I.     **Act of State Doctrine**

After 29 years of litigation between the same two parties, this Court has yet to conclusively decide whether it has jurisdiction. One issue, at least is settled: this Court has thrice held that subject matter jurisdiction exists under the commercial activities exception of the FSIA, *McKesson I,* 905 F.2d at 449–51; *McKesson II,* 52 F.3d at 350–51; *McKesson III,* 271 F.3d at 1106–07, and our previous decision made clear this is a question we will not revisit. *See McKesson V,* 539 F.3d at 488. Left open, however, is whether the act of state doctrine applies and shields Iran from liability. *Id.* at 491. The district court held that it does not, *McKesson 2009,* 2009 WL 4250767, at *5. Reviewing the question *de novo, see Agudas Chasidei Chabad of U.S. v. Russian Fed.,* 528 F.3d 934, 952–55 (D.C. Cir. 2002), we affirm.

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401 (1964). It applies when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co.,*

*Inc. v. Environmental Tectonics Corp.,* 493 U.S. 400, 405 (1990). When it applies, the doctrine serves as a "rule of decision for the courts of this country," *id.* at 406, which requires courts to deem valid the acts of foreign sovereigns taken within their own jurisdictions. *Id.* at 409.

Iran now claims that beginning in February 1980, the government imposed currency control regulations "which Pak had no choice but to follow." Appellant's Br. 38. It claims that evidence from the 2007 trial demonstrates that the currency control regulations prevented Pak from paying McKesson in any currency from February 1980 through September 29, 1981, and that after September 29, 1981, Pak could not pay McKesson in dollars without proper application and authorization by the Central Bank. We disagree with both Iran's interpretation of the act of state doctrine and the underlying factual premises of its argument.

Although the Supreme Court has not defined the contours of the "official action" requirement of the act of state doctrine, the courts of appeals have understood the concept as referring to conduct that is by nature distinctly sovereign, *i.e.*, conduct that cannot be undertaken by a private individual or entity. For example, this Court held that the denial of an official license permitting the removal of uranium from Kazakhstan was a sovereign act, as was a transfer of corporate shares to a state entity. *World Wide Minerals, Ltd. v. Republic of Kazakhstan,* 296 F.3d 1154, 1165–66 (D.C. Cir. 2002). In direct contrast to the facts in this case, the Court emphasized that the "transfer and alleged conversion were accomplished pursuant to an official decree of the Republic of Kazakhstan." *Id.* at 1166. Similarly, this Court applied the act of state doctrine where a foreign government's finance minister officially ordered payment of a tax to the foreign government through a "private letter ruling, which under

Brazilian law binds the parties." *Riggs Nat. Corp. v. Comm'r of Internal Revenue Serv.,* 163 F.3d 1363, 1366–68 (D.C. Cir. 1999). *See also Society of Lloyd's v. Siemon-Netto,* 457 F.3d 94, 102–03 (D.C. Cir. 2006) (applying the act of state doctrine to preclude a challenge to the validity of a foreign statute). In each of these cases, the Court applied the act of state doctrine to preclude challenges to actions that, by their nature, could only be undertaken by a sovereign power.

The facts of this case differ dramatically from prior cases in which the act of state doctrine applied. Although McKesson has characterized its claim as one for "expropriation," this is not a typical expropriation case in which a foreign government acts in its sovereign capacity to take private property for a public purpose. Rather, this case turns on claims that agents of the Iranian government—acting as representatives of various agencies and companies—took over Pak's board of directors, "froze out McKesson's board members, and stopped paying McKesson's dividends." *McKesson III,* 271 F.3d at 1103. The facts allege a pattern of conduct by Iran's agents that cannot fairly be characterized as public or official acts of a sovereign government. Iran did not pass a law, issue an edict or decree, or engage in formal governmental action explicitly taking McKesson's property for the benefit of the Iranian public. Instead, it allegedly took control of Pak's board of directors and abused its position as majority shareholder, making McKesson's claims "akin to a corporate dispute between majority and minority shareholders," *McKesson 1997,* 1997 WL 361177, at *10 n.17. This is not the type of "*public* act[] [of] a foreign sovereign power" to which the act of state doctrine applies. *Sabbatino*, 376 U.S. at 401; *see also Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 706 (1976) (declining to extend the act of state doctrine "to acts committed by foreign sovereigns in the course of their purely

commercial operations," such as conduct by Cuba's agents in the operation of cigar businesses for profit); *Malewicz v. City of Amsterdam,* 517 F. Supp.2d 322, 339 (D.D.C. 2007) (holding that the act of state doctrine did not apply to actions that could be taken by "any private person or entity").

Moreover, in making its argument, Iran attempts to dredge up factual issues that have long since been settled. In finding Iran liable for the withholding of McKesson's earned dividends in 1979 and 1980, the Claims Tribunal implicitly found that Pak could have paid McKesson had its board of directors chosen to do so. *See Tribunal Award,* 10 Iran-U.S. Cl. Trib. Rep. 228 (1986). Indeed, a dissenting Tribunal member noted that Iran failed to cite any law that would "render 'illegal' Pak's honoring of its contractual obligations—as, indeed, no legal authority has ever been cited for the refusal to pay dividends to Foremost." *Id.* After McKesson revived its expropriation claim, the district court likewise found that the withholding of McKesson's dividends was not the result of a "nationalization" of Pak Dairy, but rather "sound[ed] in the nature of a corporate dispute between majority and minority shareholders." *McKesson 1989,* 1989 WL 44086, at \*4. This Court affirmed that conclusion on multiple occasions. *McKesson I,* 905 F.2d at 449–50; *see also McKesson II,* 52 F.3d at 349 n.7. As such, the factual finding that McKesson's claims rest on corporate actions taken by Iran's agents on Pak's board of directors has long been established as law of the case. *See McKesson II,* 52 F.3d at 350 ("When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court."). At no point during the early stages of this litigation did Iran so much as intimate that currency control regulations prevented Pak from paying McKesson its earned dividends. It cannot raise this defense

and re-litigate the associated factual issues four appeals—and over twenty years—after it first had the opportunity to do so.

## II.      **Cause of Action**

Having established that this Court has jurisdiction over McKesson's claim, we must now decide which body of law, if any, provides McKesson with a private right of action against Iran. We previously held that the Treaty of Amity, as construed under U.S. law, does not provide McKesson with a cause of action, *McKesson V,* 539 F.3d at 491, but remanded the case to the district court to determine whether McKesson has a viable cause of action under either customary international law or Iranian law. The district court answered both questions in the affirmative. Although we reverse the court's conclusion with respect to a CIL cause of action, we agree that McKesson's suit may proceed under Iranian law.

### a.  **Customary International Law**

In *McKesson 1997,* the district court noted that customary international law "is a part of the law of the United States, and must be ascertained and enforced by federal courts." *McKesson 1997,* 1997 WL 361177, at \*15. Relying heavily on the Restatement (Third) of Foreign Relations Law, the court held that Iran is liable under customary international law because "its actions, aimed at McKesson, a foreign national, were clearly discriminatory" and "Iran neither offered nor provided any compensation to McKesson for its interest in Pak Dairy." *Id.* In *McKesson V,* we asked the district court to consider whether the Supreme Court's intervening decision in *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004), affected the viability of McKesson's cause of action under customary international law. *See McKesson V,* 539 F.3d at 491. *Sosa* involved a claim brought under the Alien Tort Statute

("ATS"), 28 U.S.C. § 1350, a jurisdictional statute originally passed as part of the Judiciary Act of 1789. The Supreme Court held that the ATS, although by its terms purely jurisdictional, can support common law causes of action under customary international law, but only if the norms allegedly violated are sufficiently specific, universal, and obligatory. *See Sosa,* 542 U.S. at 732–33. On remand, the district court found that, like the ATS, the commercial activities exception to the FSIA is "more than a jurisdictional statute," because in enacting it, Congress "demonstrated its intention that courts hear causes of action involving customary international law violations." *McKesson 2009,* 2009 WL 4250767, at *3. We disagree.

The FSIA established a broad grant of immunity for foreign sovereigns that can only be abrogated by one of the statute's narrowly drawn exceptions. 28 U.S.C. § 1330(a); *World Wide Minerals,* 296 F.3d at 1161. Jurisdiction in this case is based on the commercial activities exception, which provides that a foreign state shall not be immune from federal jurisdiction in any case in which the action is based upon, as pertinent here, "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

The FSIA is purely jurisdictional in nature, and creates no cause of action. *Republic of Austria v. Altmann,* 541 U.S. 677, 695 n.15 (2004); *Cassirer v. Kingdom of Spain,* 616 F.3d 1019, 1026 (9th Cir. 2010) (en banc); *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024, 1033–34 (D.C. Cir. 2004). The Supreme Court has explained that "[t]he language and the history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality." *First Nat'l City*

*Bank v. Banco Para El Comercio,* 462 U.S. 611, 620 (1983). The FSIA simply codified the "restrictive theory" of sovereign immunity, under which the immunity of a sovereign is recognized with regard to sovereign or public acts, but not with respect to private acts. *Altmann,* 541 U.S. at 690–91. The language of § 1605(a)(2) thus refers to commercial activity of foreign governments as a reason why the defense of foreign sovereign immunity is unavailable. It makes no mention, however, of either a private cause of action *or* customary international law.

Nonetheless, the district court found that "in enacting the commercial activities exception, Congress, in essence, demonstrated its intention that courts hear causes of action involving customary international law violations." *McKesson 2009,* 2009 WL 4250767, at *3. Yet we find no evidence— textual or otherwise— suggesting that Congress enacted the commercial activities exception on the understanding that courts would use it to *create* causes of action based on customary international law. Moreover, Congress enacted the FSIA in 1976, just one year after the Supreme Court signaled its reluctance to imply causes of action when faced with statutory silence. *See Cort v. Ash,* 422 U.S. 66, 78–80 (1975). Assuming, as we must, that Congress was aware of all pertinent legal developments when it drafted the FSIA, Congress' decision not to include an express private right of action in any provision of the FSIA reveals that its enactors intended it to be purely jurisdictional. *See South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 351 (1998).

While the Supreme Court's holding in *Sosa* is not binding here, the Court's extensive and careful scrutiny of the Alien Tort Statute illustrates the unusual circumstances necessary to find that a jurisdictional statute authorizes federal courts to derive new causes of action from customary international law.

*See Sosa,* 542 U.S. at 712–31.  For example, the Court noted that the particular "anxieties of the preconstitutional period," particularly the Continental Congress's inability to deal with cases involving offenses committed against foreign ambassadors, counseled against interpreting the ATS in a way that would strip it of any practical effect.  *Id.* at 715–19.  The Court also explained that, at the time the ATS was passed, a certain small set of actions was universally understood to be within the common law.  *Id.* at 720.  By contrast, nothing in the legislative history of the FSIA suggests that Congress intended courts to use the commercial activities exception as a vehicle to *create* new causes of action.

Also instructive is the Supreme Court's admonition to the lower courts to use caution when considering customary international law claims.  To be sure, the Court did so in the context of the Alien Tort Statute, which it understood to contemplate a "narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs." *Sosa,* 542 U.S. at 715.  The broader principles the Court expressed, however, are still relevant to this case, in which the Court is also being asked to fashion a federal common law cause of action out of the ambiguous principles of customary international law.

The Court first noted that because common law principles are now regarded as "made" rather than "discovered," a judge deciding on reliance on a perceived international norm "will find a substantial element of discretionary judgment in the decision."  *Id.* at 726.  The invocation of such judicial discretion—indeed, judicial lawmaking power—would be particularly dangerous in cases such as this one, in which jurisdiction is being asserted over a foreign sovereign.

The Court then noted that the "significant rethinking of the role of federal courts in making [common law]" caused by *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938), spawned a general practice of seeking legislative guidance "before exercising innovative authority over substantive law." *Id.* No such guidance exists here, as the text and legislative history of the FSIA merely establish the conditions in which a court may assert jurisdiction over a foreign sovereign. They do not reveal an intent to encourage—or even allow—courts to infer new common law causes of action.

The Court also emphasized the decision to create a private right of action is better left to legislative judgment—a particularly apt admonition in a case like this one, as creation of a right of action against a foreign government would certainly "raise[] issues beyond the mere consideration whether underlying primary conduct should be allowed or not[.]" *Id.* at 727. Collateral consequences can themselves be a bar, the Court recognized, particularly when the cause of action has "potential implications for the foreign relations of the United States." *Id.* The Court cautioned that because "many attempts by federal courts to craft remedies for violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution." *Id.* at 727–28. In sum, we find that the language and history of the FSIA, particularly when viewed in light of the principles enunciated in *Sosa,* do not support the creation of a private right of action for expropriation based on customary international law.

McKesson takes a different view of the legislative history of the FSIA, arguing that the statute's legislative history demonstrates that Congress "recognized that a discriminatory and uncompensated expropriation violates international law and understood that district courts would recognize private

causes of action against foreign states for expropriation in violation of [customary international law]." Appellee's Br. at 26. This argument is unpersuasive, however, because the legislative history on which McKesson relies refers to the "expropriation exception" of §1605(a)(3), an *entirely different* FSIA provision than the one conferring jurisdiction in this case. The expropriation exception applies only when rights in property "taken in violation of international law" are at issue and that property or any property exchanged for it "is present in the United States . . . or . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

McKesson's attempt to blur the boundaries between sections 1605(a)(2) and 1605(a)(3) disregards the significance of the carefully crafted limitations Congress imposed on each of the separate statutory exceptions to foreign sovereign immunity. Congress's careful drafting makes clear that each exception only applies when specific conditions are satisfied. The facts of this case clearly do not fall within the jurisdictional ambit of the expropriation exception. The property allegedly taken by Iran—McKesson's equity interest in Pak—is not present in the United States, and the entities that allegedly froze out McKesson's interest (on behalf of the government of Iran) are not engaged in commercial activity in the United States. As such, the expropriation exception is entirely irrelevant to McKesson's case, and has no effect on whether Congress intended courts to use the commercial activities exception as a vehicle to create causes of action based on customary international law.

The district court found that the Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), evinced congressional intent that courts hear causes of action for expropriation under

customary international law. *McKesson 2009,* 2009 WL 4250767, at \*4**.** McKesson picks up that refrain, adding that the Amendment embodies a sufficiently specific congressional authorization for federal courts to adjudicate expropriation claims against foreign states to constitute an independent cause of action. Appellee's Br. at 31. We disagree. The Second Hickenlooper Amendment is not a grant of jurisdiction and it does not purport to enact or codify any cause of action. Its sole purpose was to counter the Supreme Court's decision in *Sabbatino* by limiting the act of state doctrine to certain claims of expropriation. It is completely silent regarding the right to bring such claims in the first instance. As the Supreme Court has "sworn off" implied rights of action, *Alexander v. Sandoval,* 532 U.S. 275, 287 (2001), absent the compelling and unusual circumstances that animated the Court's analysis in *Sosa,* we decline to imply causes of action in the face of congressional silence.

### b.  Iranian Law

Having determined that customary international law does not provide McKesson with a cause of action, we turn now to the question of whether McKesson's suit may proceed in a U.S. court under Iranian law. We hold that the Treaty of Amity, construed under Iranian law, provides McKesson with a private right of action against the government of Iran. Having so held, we need not determine whether McKesson may seek relief under any other Iranian statutes.

Iran concedes that the Treaty provides McKesson with a cause of action, but argues that the Treaty requires McKesson to bring its suit in an Iranian court. Specifically, Iran claims that the text, context, and practical implications of the Treaty of Amity preclude McKesson from bringing its suit in a U.S.

court.  All three elements of Iran's argument fail to withstand scrutiny.

Iran first points to three textual provisions in the Treaty that, it claims, "unambiguously" show that the parties agreed that home country courts would hear disputes brought by investors of the other country.  The first is Article III, Clause 2, which provides that "[n]ationals and companies of either High Contracting Party shall have the freedom of access to the courts of justice and administrative agencies within the territories of the other High Contracting Party… both in defense and pursuit of their rights . . .".  Treaty of Amity, art. III, cl. 2, 8 U.S.T. 899.  The language of this provision offers no support for Iran's cause.  Ensuring access to the courts of each contracting party is fundamentally different from *mandating use* of those courts.  The former is the only "unambiguous" purpose of this clause.  Certainly nothing in Article III, clause 2 *prohibits* a U.S. company from bringing suit in a U.S. court.

Iran then points to Article IV, Clause 2, which provides that "[p]roperty of nationals and companies of either High Contracting Party… shall receive the most constant protection and security within the territories of the other High Contracting Party… . Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation."  Treaty of Amity, art. IV, cl. 2, 8 U.S.T. 899.  This clause simply establishes the property rights of nationals and companies of each of the parties.  It is completely silent as to how— or where— those rights can be enforced.  This provision is thus irrelevant to Iran's claim that its courts are the exclusive forum for claims brought by U.S. citizens.

Iran's final textual argument involves Article XXI, clauses 1 and 2. The former provides that "[e]ach High Contracting Party shall accord sympathetic consideration to, and shall afford adequate opportunity for consultation regarding" interpretation of the Treaty. Treaty of Amity, art. XXI, cl. 1, 8 U.S.T. 899. While the provision does represent an agreement to attempt to resolve differences through diplomacy, it does not purport to affect the *judicial* rights of a national of one country to seek judicial redress against the other government. Similarly, clause 2, which provides that any dispute between the parties "not satisfactorily adjusted by diplomacy [] shall be submitted to the International Court of Justice, unless the High Contracting Parties agree to settlement by some other pacific means[,]" does not expressly preclude a *national* from seeking judicial redress from either country's courts. *Id.* art. XXI, cl. 2. Indeed, the reference to the International Court of Justice indicates that this clause refers only to disputes among the governments themselves— and not to disputes among governments and nationals of the other contracting party—because the ICJ only arbitrates disputes between sovereigns.

Iran's arguments about the context of the Treaty of Amity are similarly unavailing. Iran first points to dicta in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S 398, 422–23 (1964), which states that "the usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal." Iran corroborates this statement with testimony by Michael Ramsey, a law professor with multiple publications on international law. While we recognize that the Supreme Court's very general statement might be true in the abstract, it reveals nothing about the available methods of relief where two countries have entered into a treaty.

Iran also notes that as of 1957, no case had been successfully brought by a U.S. investor against a foreign government in a U.S. court challenging an expropriation that had occurred abroad. The reason for this is quite obvious—the Foreign Sovereign Immunities Act was not passed until 1976. Moreover, for all we know, the Treaty could have been enacted *to facilitate* such suits as a means of encouraging foreign investment. And perhaps there was not much cross-investment prior to the mid-twentieth-century ratification of Friendship, Commerce, and Navigation Treaties (like the Treaty of Amity), which would make the absence of such cases attributable to a lack of opportunity rather than any governing legal norm.

Finally, Iran claims that McKesson's interpretation of the Treaty would lead to absurd results, because it would allow Iran to sue the United States for a taking in an Iranian court—or, for that matter, in the court of any country with personal jurisdiction over the United States. Assuming that the prospective forum country had a jurisdictional statute equivalent to the FSIA, Iran's description of the implications of McKesson's interpretation is correct. We do not find the purported "absurdity" of these consequences sufficient reason to interpret the Treaty of Amity in the manner suggested by Iran. Although we understand that forum selection is a major issue in any treaty negotiation, we also recognize that negotiations between two countries will necessarily result in an agreement containing provisions that are less than ideal for one, or both, of the parties. We find it more reasonable to interpret the Treaty's silence on the forum selection issue as allowing nationals or corporations of either country to sue in their preferred forum, as such an interpretation benefits both contracting parties by ensuring that nationals of each country will have the fullest opportunity to recover their losses in the event of an unlawful expropriation. Under Iran's

interpretation, by contrast, Iranian citizens would be forced to sue in the United States—a consequence that seems just as "absurd," if not more so, than the consequences arising out of our decision to allow McKesson's Treaty-based claim to proceed in U.S. court.

There is no tension between our decision here and our prior decision in *McKesson V,* in which we held that the Treaty of Amity did not provide a cause of action under U.S. law. The United States Supreme Court has long recognized a presumption against finding treaty-based causes of action, *see Medellin v. Texas,* 552 U.S. 491, 506 n.3 (2004), because the decision to create a private right of action "is one better left to legislative judgment in the great majority of cases." *Sosa,* 542 U.S. at 727. Iranian law—by Iran's own explanation—operates differently. Iran has conceded that the Treaty of Amity creates a private right of action under Iranian law, and only contests whether the Treaty permits McKesson to bring its claim in a U.S. court. *See* Appellant's Br. at 9–10 (arguing that "the Treaty unambiguously provides for a Treaty suit against Iran in Iran and that failing, the ICJ"). Moreover, Iran has produced no evidence indicating that its domestic law recognizes a similar presumption against implying causes of action under treaties. To the contrary, Iran's own expert testified that "the Treaty is a special law which supersedes the general Iranian laws," Sanaei Op. at 4, and Iran argued in its brief that the general laws of Iran do not provide separate causes of action because "the Treaty—as *lex specialis*—provides the sole [cause of action]." Appellant's Br. at 25.

In sum, we hold that the Treaty of Amity provides McKesson with a private right of action against Iran under Iranian law, and that McKesson's suit can proceed in the U.S. courts. Because we find that the Treaty of Amity provides McKesson with a cause of action, we need not determine the

viability of McKesson's claims that Iran violated Article I of the Civil Responsibility Act of Iran, Article 308 of the Civil Code of Iran, or the Commercial Code of Iran. Accordingly, we also need not address Iran's argument that the Treaty cause of action for expropriation is exclusive and supersedes all other possible Iranian law causes of action.

### III.      **Liability under the Treaty of Amity**

The Treaty of Amity provides:

> Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law. Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

Treaty of Amity, art. IV, para. 2. The district court noted that, aside from arguing that McKesson's Treaty claim must be brought in Iran and is the exclusive remedy, Iran offered no defense to this cause of action. *McKesson 2010,* 752 F. Supp. 2d at 17. Accordingly, based on its prior findings that Iran caused McKesson's dividends and investment to be taken without compensation, the district court found McKesson liable under the Treaty of Amity and reinstated its earlier award of damages, which was equivalent to the full value of the expropriated property plus simple interest, calculated through May 26, 2000. *Id.* at 18.

Iran now raises three challenges to the findings of the district court. First, it claims the district court erred by ignoring attribution principles under Iranian law. Second, it claims the non-payment of dividends resulted from a sovereign decision to control capital flight. Finally, it argues that under Iranian law, Pak's board exercised its discretion to implement a "come to the company" requirement by at least October 26, 1981. Acceptance of any of these arguments, however, would require this Court to revisit—and indeed, overwrite—factual findings that have long since been settled. Accordingly, we reject Iran's arguments and uphold the district court's holding that Iran is liable to McKesson under the Treaty of Amity.

Iran's first argument—that under Iranian law, the government of Iran cannot be held responsible for the actions of Pak's board of directors—is by far its most compelling, because it does reveal a significant flaw in the reasoning of the district court. The district court did not explicitly analyze whether, under Iranian law, the government could be held responsible for actions of its purported agents. Rather, the court noted that prior rulings of the district court "have established fault in this case on the part of Iran, as 'Pak Dairy's board and its government shareholders forced the dairy to disregard its commercial mission and its duties to McKesson as a shareholder.'" *McKesson 2010,* 752 F. Supp. 2d at 19 (quoting *McKesson II,* 52 F.3d at 351). However, any reliance on *McKesson 1997,* or any prior legal finding of attribution by either this Court or the district court, was misplaced, as none of those cases evaluated attribution under the principles of Iranian law.

But acceptance of Iran's argument would lead to an untenable result, as it would prevent foreign investors from obtaining any recourse under the Treaty-based cause of action

that Iran has repeatedly acknowledged. By claiming that it cannot be held responsible under the Treaty—or under any of the private laws of Iran—for the actions of its agents, Iran attempts to engage in a legal sleight of hand. Even a suit in Iranian court would be pointless, as the government could not be held liable for the actions of McKesson's board of directors regardless of the forum adjudicating the cause of action.

Iran's claim that its domestic law precludes attribution of the Board's unlawful behavior to the government is fatally flawed, because it contradicts the plain language of the Treaty and thus ignores the *Iranian* law principle that "the Treaty is a special law which supersedes the general Iranian laws." Appellant's Br. at 24. The language of the Treaty does not distinguish between direct and creeping expropriation; it simply provides that property of foreign nationals "shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation." Treaty of Amity, art. IV, para.2. Whether the property was taken through interference by a state in the use of that property or through a formal expropriatory decree is immaterial. *See Tribunal Award,* 10 Iran-U.S. Cl. Trib. Rep. 228 (explaining that "[i]t is well settled, in this Tribunal's practice as elsewhere, that property may be taken under international law through interference by a state in the use of that property or with the enjoyment of its benefits. This remains true in the absence of a formal expropriatory decree, even where the formal legal title to the property is not affected."). Here, the factual finding that Iran controlled six of the seven seats on Pak Dairy's board of directors and dictated the company's routine business decisions, including declaring and paying dividends and honoring the dairy's contractual commitments, is well-settled law of the case. *McKesson II,* 52 F.3d at 351–52. Twenty years ago, the district court found that "[t]he

board decided that Pak Dairy would not pay any money to foreign shareholders, including McKesson" and that the "extensive involvement in day-to-day operations of Pak Dairy" is evidence that the business was under the complete control of the Iranian government. *Id.* at 352. Iran's challenge to that factual finding was subsequently addressed and rejected by this Court. *Id.* Put simply, we agree with the Tribunal that the language of the Treaty renders Iran liable for the taking of McKesson's property.

Iran's attempt to circumvent the language of the Treaty is, ironically, undermined by its own explanation of how the Treaty interacts with Iranian private law. Iran claims that the rule under Iranian law is that "no one is liable for the actions of another." Appellant's Br. at 51. But while arguing that the Treaty supersedes all causes of action under Iranian private law, Iran's expert testified that "the Treaty is a special law which supersedes the general Iranian laws." Sanaei Op. at 4. Assuming the internal consistency of Iranian law, this principle must not only hold true when evaluating causes of action, but also when determining liability. Iran cannot have it both ways—it cannot claim that the Treaty trumps its domestic laws by foreclosing other causes of action while simultaneously claiming that its domestic laws regarding vicarious liability trump the plain language of the Treaty, which would hold Iran liable for *any* taking of the property of foreign nationals. We thus find Iran's attribution defense unavailing because it conflicts with both the language of the Treaty and Iran's description of the hierarchy of its own laws.

Iran's two other defenses are barred by the law of the case doctrine. First, Iran argues the non-payment of dividends was caused by a sovereign decision to prevent capital flight. As explained above, the district court previously determined that Pak's failure to pay dividends to

McKesson resulted from a corporate decision by Pak's board of directors, not from a sovereign decision to stanch the flow of capital from the country. *See McKesson 2010,* 752 F. Supp. 2d at 16 ("[I]t is hard to imagine how Iran could legitimately believe the currency controls defense is still viable at this stage of the litigation, given my ruling in 2009 that Iran's actions were 'commercial in nature' and that the act of state doctrine therefore does not apply.").

Second, Iran claims Pak implemented a "come to the company" requirement for the payment of dividends under Iranian law. Iran's attempt to re-litigate this defense is even more brazen, as Iran's argument that "custom and practice" in Iran established a "come to the company" requirement at Pak *as a matter of Iranian law* was rejected on summary judgment in 1997 and affirmed by this Court in *McKesson III,* 271 F.3d at 1109 (holding that the affidavits provided by Iran's experts "fall short of proving that this general practice reflects a legal requirement" and that "no general principle of Iranian corporate law excuses [Pak's] withholding of McKesson's dividends due to failure to come to the company"). We did, however, find that Iran made a credible showing that Pak exercised its discretion to implement a "come to the company" requirement and denied McKesson's motion for summary judgment. *Id.* But during the 2007 trial before the district court, Iran failed to prove its factual defense that Pak had in fact adopted such a requirement. *See McKesson 2007,* 520 F. Supp. 2d at 50–51. This Court remains bound by its prior factual findings even where the governing body of law changes. *See LaShawn A. v. Barry,* 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("The Supreme Court has instructed the lower courts to be loathe to reconsider issues already decided in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice."). Our adjudication of this case under

Iranian law does not provide Iran with the opportunity to re-litigate questions of fact that have previously been found in McKesson's favor.

## IV. Award of Compound Interest

We now turn to the district court's decision to award McKesson compound interest from May 27, 2000 through the present day. The district court found that "[u]nder Iranian law, this Court is not constrained to award simple interest, and Iran does not argue to the contrary." *McKesson 2010,* 752 F. Supp. 2d at 22. Noting that Iranian law provides no guidance on when an award of compound interest is appropriate, the court looked to federal common law, under which compound interest is appropriate where simple interest is insufficient to make plaintiffs whole. *Id.* Although awards of damages are generally reviewed for abuse of discretion, we review the district court's award of compound interest *de novo* because it requires us to interpret foreign law. *See City of Harper Woods Employees' Retirement Sys. v. Olver,* 589 F.3d 1292, 1298 (D.C. Cir. 2009). Upon review of the record, we reverse, and in accordance with our prior ruling in *McKesson III,* remand for calculation of an award based on simple interest.

Iran argues its domestic laws do not recognize compound interest, and the record contains ample support for its claim. Nowhere in the record does either expert on Iranian law explicitly state that Iranian law permits the award of compound interest. The closest analogue appears to be "late payment damages" or "damages for delay of payment," which, at first glance, might reasonably be translated as "interest." Sanaei Op. at 15. Further review of the record, however, reveals that Iranian law awards damages for delay of payment under a very narrow set of circumstances. To

receive an award of delay damages, a plaintiff must establish: (a) a debt owed in Iranian currency; (b) a valid demand for the debt by the creditor and a refusal to pay by the debtor; and (c) an evident difference between the price indices [published by Iran's central bank] from the time of maturity to the time at which the creditor demanded payment. *Id.* As explained even by McKesson's expert, Article 520 of the Iranian Civil Procedure Code further explains that "[w]ith respect to demanding the [delay] damages sustained, plaintiff must prove the reason that the sustained loss has directly resulted from [defendant's] failure or delay to perform the obligation and/or deliver the relief sought. Otherwise the damages would be dismissed by the court." Katirai Second Supp. Op. at 15. When viewed in context of the circumstances in which it can be awarded, "delay damages" clearly does not refer to "compound interest," because compound interest does not purport to quantify an actual loss. The Iranian concept of "delay damages" refers to actual damages based on fluctuations in the value of the Iranian currency, not to any type of interest.

In fact, the Iranian Code of Civil Procedure Article 712 explicitly states that "[d]amages which are arisen out of damages shall not be recovered," Katirai Op. at 709,[1] which implies that *any* recovery of interest is forbidden under Iranian law, much less compound interest. Iran's expert opined that under Islamic and Sharia law, payment of interest is forbidden, Sanaei Op. at 15, and statements made by Iran's religious leaders implicitly support his interpretation. *See*

---

[1] Katirai notes that this provision "[has] not been repeated" in the Iranian Civil Procedure Act of 2000, but he does not claim that it has been repealed. In its brief, Iran references a 2005 judgment from the Tehran Court of Appeals that interpreted this provision. *See* Appellant's Br. at 61.

Katirai Op. at 38 (quoting Ayatollah Ali Khamenei's statement that "[d]amages resulting from a delay in payment of a debt . . . is owed by the debtor and is not subject to the rules applicable to interest"). Perhaps fortunately for McKesson, Iran does not argue that an award of simple interest is contrary to Iranian law. In response, McKesson's expert on Iranian law simply states, *ipse dixit,* that Iran "has adopted the principles of customary international law concerning the payment of interest as a component of full compensation for the expropriation of a foreign investment in Iran," and points to Iran's enactment of legislation adopting the Treaty of Amity and other bi-lateral investment treaties. Katirai Second Supp. Op. at 13. His reliance on the Treaty of Amity is misplaced, however, because the standard for "full compensation" prescribed by the Treaty is ambiguous regarding the award of interest. Moreover, the Treaty was enacted long before the Islamic Revolution took place, making it erroneous to assume that Iran's current legal system is identical to the one in place when the Treaty was enacted. In light of the utter lack of evidence indicating that compound interest is a recognized remedy under Iranian law, we reverse that portion of the award; however, because Iran does not challenge the award of simple interest in this case, we remand for calculation of an award consisting of the value of McKesson's expropriated interest in Pak and its withheld dividends plus simple interest.

## VI. Conclusion

We affirm the district court's holding that the act of state doctrine does not apply in this case. While we reverse the court's holding that McKesson may base its claim on customary international law, we affirm its alternative holding that the Treaty of Amity, construed as Iranian law, provides McKesson with a private right of action, and we further

affirm its finding that Iran is liable for the expropriation of McKesson's equity interest in Pak and the withholding of McKesson's dividend payments. Finally, we reverse the court's award of compound interest and remand for calculation of an award consisting of the value of McKesson's expropriated property and withheld dividends plus simple interest. Because the district court already conducted a detailed valuation of McKesson's equity interest in Pak in *McKesson 2000,* we hope the district court can put an end to nearly thirty years of litigation through some simple multiplication.

*So ordered.*