# United States Court of Appeals for the Federal Circuit

---

**LESSORS OF ABCHAKAN VILLAGE, LOGAR PROVINCE, AFGHANISTAN,**
*Appellants*

**v.**

**SECRETARY OF DEFENSE,**
*Appellee*

---

2023-1523

---

Appeal from the Armed Services Board of Contract Appeals in No. 61787, Administrative Judge J. Reid Prouty, Administrative Judge James R. Sweet, Administrative Judge Richard Shackleford.

---

Decided: May 16, 2025

---

WILLIAM PERDUE, Arnold & Porter Kaye Scholer LLP, Washington, DC, argued for appellants. Also represented by MICHAEL BARNICLE, PETER VOGEL, Chicago, IL; ELIZABETH A. LONG, WILLIAM SHARON, New York, NY; KEITH J. FEIGENBAUM, Paul Hastings LLP, Washington, DC.

ANTHONY F. SCHIAVETTI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also

represented by BRIAN M. BOYNTON, VINCENT DE PAUL PHILLIPS, JR., MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY.

———————

Before MOORE, *Chief Judge*, CUNNINGHAM, *Circuit Judge*, and MAZZANT, *Chief District Judge*.[1]

PER CURIAM.

Lessors of Abchakan Village, Logar Province, Afghanistan ("the Lessors" or "Appellants") appeal a decision of the Armed Services Board of Contract Appeals ("Board") granting the U.S. government summary judgment and denying the Lessors' appeal. *Lessors of Abchakan Vill., Logar Province, Afghanistan*, ASBCA No. 61787, 22-1 BCA ¶ 38,234, 2022 WL 17331987 (Oct. 13, 2022) ("*Decision*") (J.A. 1–26).[2] For the reasons explained below, we vacate the judgment and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

This appeal concerns the U.S. government's occupation and use of land in Afghanistan and the government's alleged failure to pay the Lessors for use of the land. In this section, we first provide an overview of the party interactions giving rise to this appeal; we then describe relevant proceedings in the courts of Afghanistan and agreements between the United States and the former government of

———————

[1]    Honorable Amos Mazzant, Chief District Judge, United States District Court for the Eastern District of Texas, sitting by designation.

[2]    Because the reported version of the Board's decision is not paginated, citations in this opinion are to the version of the Board's decision included in the Joint Appendix. For example, *Decision* at 1 is found at J.A. 1.

Afghanistan; and we then turn to the procedural history before the Board.

### A.

The Lessors are residents of Abchakan Village in Logar Province, Afghanistan. Appellants' Br. 1; J.A. 428. On April 23, 2009, the Lessors leased to the United States real property ("the Land") for a United States military base, known as Forward Operating Base Shank ("FOB Shank"), located in Logar Province. *Decision* at 2–3. Representatives for the United States Army Corps of Engineers executed the relevant lease agreements on behalf of the United States. J.A. 115–98. A U.S. government report indicates that before entering into the lease agreements, the United States military had occupied portions of the Land for over two years without paying rent. J.A. 1324 (negotiations report relating to the Land stating back rent was "[n]egotiated . . . for the past 2.5 years of occupation of FOB Shank located [at a specified location] down to $0"); J.A. 1325 (memorandum recommending approval of funding request to pay lease rents and explaining "[t]he United States has no formal real estate interest in the areas occupied and has trespassed on private property").

The lease agreements had a one-year term covering calendar year 2009. *Decision* at 3; *see also* J.A. 115–98. On July 14, 2009, the U.S. government paid rent in the amount of approximately $2.6 million for the lease period. *Decision* at 3; *see also* J.A. 436. In November 2009, the U.S. government sent the Lessors correspondence entitled "Written Notification of Intent to Lease FOB Shank Land from 1JAN10 Through 31DEC10," which "request[ed] to continue leasing the [L]and on which FOB Shank is located from 1JAN10 to 31DEC10." J.A. 2089. The Lessors allege that "[f]or calendar years 2011 through [October 15, 2018], the [U.S.] [g]overnment or its assignee occupied the [Land] and enjoyed the full use of the [Land] without Lessor interference." J.A. 437, 447; *see also Decision* at 3. The U.S.

government does not dispute that "the United States continued to operate FOB Shank" through at least 2014 and that the United States "later established Camp Dhalke on a portion of what was then FOB Shank." Appellee's Br. 5–6; *Decision* at 4 n.4. The Lessors also allege, and the U.S. government does not dispute, that the U.S. government did not pay the Lessors rent after the July 14, 2009, payment. *See Decision* at 3–4; *see also* Appellants' Br. 1; Appellee's Br. 4–5; J.A. 436–38.

In December 2009, a provincial justice department of the Government of the Islamic Republic of Afghanistan ("GIRoA")[3] filed a civil lawsuit ("the Afghan lawsuit") in a court of Afghanistan, alleging that the Land belonged to GIRoA and that the Lessors' ownership documents were fraudulent. J.A. 439; *see also* J.A. 1233, 1292. In August 2010, the U.S. government sent letters to the Lessors stating:

> [T]his letter provides written notification that your ownership documents have come into question. Although this lease has expired, you must submit official, verifiable documentation to this office. Verifiable documentation means approved by the legal system of the Islamic Republic of Afghanistan.

> If it is determined that your claim of ownership was false, all rental monies paid to you under [the] Lease . . . must be refunded to the United State[s.]

---

[3]    GIRoA was the government in control of Afghanistan at the time the leases were executed. In August 2021, the Taliban overthrew GIRoA. *See Decision* at 9 n.7 ("On August 6, 2021, the Taliban captured its first provincial capital. On August 15, 2021, Taliban forces entered Kabul, and the GIRoA collapsed." (citation omitted)).

J.A. 2392; *see also Decision* at 3–4. On November 17, 2012, the U.S. government sent a letter to the Lessors, indicating that the Land ownership had been in dispute for many years. *Decision* at 4; J.A. 1783. The letter stated that "[b]ecause of those concerns, the United States Government has stopped all lease actions and payments until the land ownership is clearly and legally identified." J.A. 1783.

B.

Relevant to this appeal are several proceedings in the courts of Afghanistan, as well as interactions between the United States and GIRoA.

On September 30, 2014, the United States and GIRoA entered into a Bilateral Security Agreement. *Decision* at 4. Under the Bilateral Security Agreement, GIRoA "provide[d] access to and use of the agreed facilities and areas, as defined in paragraph 7 of Article 1." J.A. 1178; *Decision* at 4. The Bilateral Security Agreement Article 1(7) defined "[a]greed facilities and areas" as "the facilities and areas in the territory of Afghanistan provided by Afghanistan at the locations listed in Annex A, and such other facilities and areas in the territory of Afghanistan as may be provided by Afghanistan in the future, to which United States forces . . . shall have the right to access and use pursuant to this Agreement." J.A. 1171; *Decision* at 4. Annex A listed several facilities not including FOB Shank but envisioned use of "other facilities and areas at other locations in Afghanistan as may be agreed and authorized by the Minister of Defense." J.A. 1197; *Decision* at 4–5. By 2014, FOB Shank "was the third largest U.S. base in Afghanistan . . . , housing nearly 5,200 personnel." J.A. 1925; *see also Decision* at 4 n.4. In 2014, the United States turned FOB Shank over to GIRoA. *Decision* at 4 n.4. As noted above, however, the United States later established Camp Dhalke on a part of what was then FOB Shank. *Id.*

Meanwhile, the Afghan lawsuit proceeded. According to a declaration submitted on behalf of the Lessors, in 2009,

an Afghan provincial court dismissed GIRoA's claims, and GIRoA then appealed that decision. *See* J.A. 1292. A series of appeals and decisions of Afghanistan courts followed. In 2015, an Afghan appellate court issued a decision in the Lessors' favor. *Decision* at 5; J.A. 249, 1784, 2092. Based on the Lessors' purported ownership documents, which include a deed and tax and water documents, the Afghan appellate court held that GIRoA's claims "were not proved." J.A. 2092; *see also* J.A. 249, 1784. GIRoA appealed to the Afghanistan Supreme Court. *Decision* at 5.

On December 19, 2017, while the Afghan lawsuit was pending before the Afghanistan Supreme Court, GIRoA provided the United States with a declaration ("the 2017 Declaration") executed by GIRoA's Minister of Defense. *Decision* at 5; J.A. 1216; *see also* J.A. 1214–19. The 2017 Declaration indicates that the Minister of Defense "authorize[d] Camp Dhalke and its expansion into FOB Shank . . . as an Agreed Facility and Area for the use of U.S. Forces in accordance with the [Bilateral Security Agreement]." J.A. 1216. The 2017 Declaration was specifically "executed in accordance with Annex A of the [Bilateral Security Agreement]." *Id.* The 2017 Declaration further states that "GIRoA covenants that it has the legal authority over the [L]and necessary to effect this agreement and authorization." *Id.* It also states that "[a]ny and all claims made against the Camp Dhalke and FOB Shank land or regarding the ownership of this [L]and are the responsibility of GIRoA and shall be resolved in full by GIRoA." *Id.* On February 20, 2018, the Afghanistan Supreme Court issued a decision ("the 2018 Remand Decision") "repeal[ing]" the Afghan appellate court's 2015 decision and remanding the case. *Decision* at 7; *see*

J.A. 1232–41.[4] In the 2018 Remand Decision, the Afghanistan Supreme Court determined that GIRoA "was not given the opportunity to prove [its] claims reflecting [the] fraudulent deed document" and that "th[e] case require[d] . . . a thorough investigation." J.A. 1240. The Afghanistan Supreme Court referred the case to another Afghan court; the case later was transferred to the Special Appeals Court for Government Land Usurpation Cases ("Land Court"). *See* J.A. 1293, 1302, 1373.

On October 3, 2018, the GIRoA Ministry of Defense provided the United States with another declaration ("the 2018 Declaration") regarding ownership of the land on which FOB Shank and Camp Dhalke were located. *Decision* at 8; J.A. 1221. The 2018 Declaration stated:

> The Ministry of Defense (MoD) hereby declares, acknowledges and validates its prior Declaration of 19 December 2017 authorizing the use of FOB Shank and Camp Dhalke, asserting GIRoA land ownership over this area, and accepting full responsibility for any and all land claims that may arise over the use of this area, including accepting for resolution any such land claims filed against the United States Government.

J.A. 1221.

On August 11, 2021, after a property investigation, the Land Court dismissed GIRoA's claim to the Land ("the

---

[4]    The parties provided a different translation of the 2018 Remand Decision at J.A. 973–80. For purposes of this appeal, we see no meaningful difference between the provided translations. *Compare* J.A. 1240 (explaining the 2015 decision was "repealed"), *with* J.A. 979–80 (explaining the 2015 decision was "annulled"). Throughout this opinion, we cite to the translation provided at J.A. 1232–41.

2021 Decision"). *Decision* at 8–9; J.A. 1305 ("unanimously dismiss[ing] the claim made by . . . the [GIRoA] government representative"). The Land Court held that the claims made by GIRoA's attorney were "not verified" and ordered that GIRoA "shall not bother the [Lessors] and their attorneys from now on regarding the claimed property." J.A. 1305.

Shortly after the Land Court issued its 2021 Decision, the Taliban overthrew GIRoA. *See Decision* at 9 n.7. The fall of GIRoA raised questions about whether the Taliban would "implement judgments issued by the courts of the previous administration," including the 2021 Decision. J.A. 2362. However, on February 15, 2022, the Afghanistan Supreme Court, under the new Taliban regime, issued an order—or "fatwa"[5] ("the 2022 Fatwa")—directing that the 2021 Decision "be implemented." J.A. 1596.

## C.

We now turn to the procedural history before the Board. On April 13, 2018, the Lessors submitted to the U.S. Army Corps of Engineers a certified claim letter demanding approximately $28 million from the Corps for unpaid rent, interest, and deferred payment losses. *Decision* at 10; J.A. 38, 93, 112. On September 4, 2018, the Corps issued a contracting officer's final decision denying the claim. *Decision* at 10; J.A. 27–29. The Lessors appealed to the Board, J.A. 423, and then filed a five-count complaint. J.A. 428–47; *see also Decision* at 10.

On December 13, 2019, the U.S. government moved to dismiss on the ground that the Lessors' counsel had no authority to act on behalf of the Lessors. J.A. 537–48; *see also Decision* at 1. On July 21, 2021, the Board denied the U.S.

---

[5]    "A fatwa is a legal ruling or opinion given by a recognized authority on Islamic law." *Decision* at 10 n.8.

government's first motion to dismiss based on that ground. *Decision* at 1; J.A. 1091–97.

On October 18, 2021, the U.S. government filed a second motion to dismiss and motion for judgment on the pleadings, arguing that the Lessors' claims were: (1) barred by the act of state doctrine; (2) unripe and not justiciable due to the ongoing judicial proceedings in the Afghanistan courts; and (3) inadequately pled. J.A. 1136–38; *see also* J.A. 1131–66. The parties submitted sur-replies, J.A. 1547–85, 2273–322, but the Board administrative judge did not hear oral argument on the government's motion. *See* J.A. 80–92.

On October 13, 2022, the Board issued its decision. *Decision* at 1–26. The Board converted the government's motion to dismiss for failure to state a claim to one for summary judgment "because the parties rel[ied] upon materials outside of the pleadings." *Id.* at 2. The Board then granted summary judgment in favor of the U.S. government on two grounds. *Id.*

First, the Board held that the Lessors "failed to raise a genuine issue of material fact suggesting that they owned the Land." *Id.* at 11. The Board "decline[d] to recognize" the 2021 Decision and 2022 Fatwa. *Id.* at 13; *see also id.* at 12–16. The Board treated the 2018 Remand Decision as a "final and conclusive judgment," *id.* at 17, entitled to recognition, and thus triggering issue preclusion. *Id.* at 16–19. The Board also found that "no reasonable factfinder" could rely on the Lessors' ownership documents because "the tax and water rights documents . . . were insufficient to cover the Land" and the "deed's handwriting differs from the handwriting on prior and subsequent deeds." *Id.* at 19.

Second, the Board held that "to provide [the Lessors] with the relief that they seek . . . would violate the act of state doctrine." *Id.* at 20. The Board reasoned that, in the 2017 and 2018 Declarations, GIRoA "ha[d] taken the

10                LESSORS OF ABCHAKAN VILLAGE v. DEFENSE

official act within its territory of asserting its ownership of the Land," *id.* at 20, and that granting relief to the Lessors "would require [the Board] to declare invalid that GIRoA official act of asserting its ownership over the Land." *Id.* at 21.

The Lessors timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## II.  STANDARD OF REVIEW

"We review de novo the Board's conclusions of law, including grants of summary judgment, and the interpretation of a government contract." *Cooper/Ports Am., LLC v. Sec'y of Def.*, 959 F.3d 1373, 1377 (Fed. Cir. 2020) (internal quotation marks and citations omitted). "Summary judgment is appropriate when the record, when examined in a light most favorable to the non-movant, indicates that 'there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.'" *Ryste & Ricas, Inc. v. Harvey*, 477 F.3d 1337, 1340 (Fed. Cir. 2007) (quoting *Flexfab L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005)).

"[T]he decision of the [Board] on a question of fact is final and conclusive and may not be set aside unless the decision is—(A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence." 41 U.S.C. § 7107(b)(2)(A)–(C); *see also Boeing Co. v. Sec'y of Air Force*, 983 F.3d 1321, 1333 (Fed. Cir. 2020).

## III. DISCUSSION

Before this court, the Lessors argue that the Board erred in concluding that (1) the Lessors failed to raise a genuine issue of material fact regarding their ownership of the Land, *see* Appellants' Br. 19–20; *see also id.* at 23–46; and (2) the Lessors' contractual claims are barred by the act of state doctrine. *Id.* at 22; *see also id.* at 46–60. The U.S. government addresses the issues that the Lessors

raise, Appellee's Br. 25–35, 38–43, but also argues that we should affirm the Board's grant of summary judgment because the Lessors cannot establish mutual intent to contract after 2009, *id.* at 15–19, and the Lessors' claims are espoused and extinguished, *id.* at 36; *see also id.* at 21–23, 35, 37–38.  We address each argument in turn.

### A.

The Lessors argue that the Board erred in granting summary judgment to the government because the Lessors raised genuine issues of material fact regarding ownership of the Land.  *See* Appellants' Br. 23.  First, the Lessors argue the U.S. government bore—and failed to carry—the burden of proving that the Lessors do not own the Land.  *Id.* at 23–26.  Second, the Lessors argue that the Board erred by not recognizing the 2021 Decision of the Land Court.  *Id.* at 28–37.  The Lessors argue that the 2021 Decision and 2022 Fatwa prove as a matter of law that the Lessors own the Land or, at minimum, raise genuine issues of material fact precluding granting summary judgment to the U.S. government on this issue.  *Id.* at 26.  Third, the Lessors argue that their deed, tax documents, and water-rights documents separately raise genuine issues of material fact and that the Board's refusal to credit these documents was improper.  *Id.* at 38–45.

The U.S. government counters that the burden of proving land ownership should properly be on the Lessors as part of their burden to show a valid contract.  Appellee's Br. 15–16.  Regarding the genuine issues of material fact that the Lessors allege, the U.S. government primarily points back to the Board's findings.  *See id.* at 38–43.

We agree with the Lessors that the Board erred in granting summary judgment to the government because the record before us, "when examined in a light most favorable to the non-movant," fails to show that "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  *Ryste & Ricas*, 477 F.3d at

1340 (quoting *Flexfab*, 424 F.3d at 1259). We find the government's arguments to the contrary unpersuasive.

i.

We start with the burden of proof. We conclude that the Board did not err by placing the burden on the Lessors to show they owned the Land. As a practical matter, when "one party has superior access to the evidence needed to prove [a] fact[,] . . . that party must bear the burdens of proof." 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5122 (2d ed. 2005). In this case, the Lessors are the purported landowners, and they reside in Afghanistan. As compared to the U.S. government, the Lessors have superior access to the evidence needed to prove their ownership of the Land, which is also located in Afghanistan. Accordingly, we decline to disturb the Board's placement of the burden of proof regarding ownership.

ii.

We next turn to the Lessors' contentions that the Board erred in not recognizing the 2021 Decision. This court has recognized that, "at least as of 2008, seven types of documents may serve as proof of land ownership" under GIRoA law, including "documents of a legal court." *Sharifi v. United States*, 987 F.3d 1063, 1068 (Fed. Cir. 2021). The Lessors seek to rely on the 2021 Decision to prove that they own the Land. *See, e.g.*, Appellants' Reply Br. 2. We do not decide whether the 2021 Decision conclusively proves ownership of the Land. However, we conclude that the Board erred in its non-recognition analysis and in resolving this issue at summary judgment.

Ownership of the Land is a material fact question over which there is a genuine dispute. In the 2021 Decision, the Land Court found "the [L]and is privately-owned" by the individuals and residents of Abchakan Village and determined that the claims made by GIRoA's attorney were "not

verified by the court." J.A. 1304–05. In resolving Land ownership at summary judgment, the Board based its decision in part on "exercis[ing] [its] discretionary power and declin[ing] to recognize [the 2021 Decision] under Restatement [(Fourth) of Foreign Relations Law of the United States ("Restatement")] § 484 [(2018)]." *Decision* at 13; *see also id.* at 12–14. But the Board erred in its analysis leading to its nonrecognition conclusion.

The Board relied on three of the nine discretionary grounds outlined in Restatement § 484, which states:

> To the extent provided by applicable law, a court in the United States need not recognize a judgment of a court of a foreign state if: (a) the party resisting recognition did not receive adequate notice of the proceeding in the foreign court in sufficient time to enable it to defend; . . . (g) the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment; [or] (h) the specific proceeding in the foreign court leading to the judgment was not compatible with fundamental principles of fairness . . . .

The record here has not been developed sufficiently to support the Board's conclusion based on these grounds.[6]

---

[6] The government failed to address these specific grounds on appeal. The government primarily argued that "[the Lessors] fail to persuasively explain how the 2018 Afghan Supreme Court decision [i.e., 2018 Remand Decision] could be reconciled with the subsequent Afghan court decisions [i.e., including the 2021 Decision]." Appellee's Br. 40. But for the reasons explained later in this opinion, the 2018 Remand Decision is not a final decision entitled to preclusive effect. *See infra* at 15–16.

First, the Board concluded GIRoA "did not receive notice of the proceedings in sufficient time to enable it to defend" its position before the Afghanistan court on remand following the 2018 Remand Decision and thus found that the Afghanistan court "failed to provide the GIRoA with notice and an opportunity to be heard." *Decision* at 13; *see also id.* at 9; Restatement § 484(a). But there is simply not enough evidence in the record before us to conclude as a matter of law that any notice or opportunity to be heard was lacking. The Board only cited a declaration from the government's expert, containing allegations made by a purported prosecutor for GIRoA, to support its lack of notice conclusion. *See Decision* at 9 (citing J.A. 1374 ¶ 17). When viewing the record in a light most favorable to the Lessors, we conclude that the Board prematurely decided a material factual question, adequacy of notice, that required further factual development.

Second, the Board failed to explain why the proceedings before the Land Court, which issued the 2021 Decision before the fall of GIRoA, were not "compatible with fundamental principles of fairness," Restatement § 484(h), beyond referencing these same "notice and opportunity to be heard" concerns. *Decision* at 13, *see also id.* at 12, 14. We are similarly unconvinced, without further development of the facts, that this ground applies or was appropriately resolved at summary judgment.

Third, the Board erred in concluding that the 2021 Decision "was rendered in circumstances that raise substantial doubts about the integrity of the rendering court with respect to the judgment," *Decision* at 13, because this ground of nonrecognition "requires a showing of corruption in the particular case that had an impact on the judgment rendered." Restatement § 484(g) cmt. i. The Board did not address the corruption requirement, and the government has not made such a showing of corruption. Accordingly, we conclude that the Board erred in its analysis of each of the Restatement § 484 grounds and thus erred by deciding

at the summary judgment stage that the 2021 Decision was not entitled to recognition.

We do not decide whether the 2021 Decision conclusively proves ownership of the Land. Nor do we decide that the 2021 Decision was entitled to recognition as a foreign judgment. We conclude only that the Board erred in its analysis that led it to refuse to recognize the 2021 Decision and in resolving the Land ownership issue at the summary judgment stage.[7]

iii.

The Lessors identify three other types of documents that they allege raise genuine issues of material fact: a deed, water-rights documents, and tax documents. Appellants' Br. 38–39. The Board found that those documents do not raise genuine issues of material fact because (1) the 2018 Remand Decision was a final and conclusive judgment that created issue preclusion, *Decision* at 17; and (2) no reasonable factfinder could conclude that the documents establish that the Lessors owned the land, *id.* at 19. We conclude that the Board erred in both determinations.

The 2018 Remand Decision is not "a final, conclusive, and enforceable judgment" entitled to preclusive effect. Restatement § 481 ("[A] final, conclusive, and enforceable judgment of a court of a foreign state granting or denying recovery of a sum of money, or determining a legal controversy, is entitled to recognition by courts in the United States."); *see also* Restatement § 487 ("A foreign judgment entitled to recognition under [Restatement] § 481 is given the same preclusive effect by a court in the United States

---

[7] The Board also declined to recognize the 2022 Fatwa. *Decision* at 13. Because we find that the Board erred in granting summary judgment in light of the 2021 Decision, we do not need to separately address the 2022 Fatwa to decide this case.

as the judgment of a sister State entitled to full faith and credit."). Issue preclusion only applies if the relevant issue was decided in a prior action that "has been finally adjudicated on the merits." *Jones v. United States*, 846 F.3d 1343, 1361 (Fed. Cir. 2017).

The 2018 Remand Decision did not "finally adjudicate[] on the merits" the relevant issues. *Id.* In the 2018 Remand Decision, the Afghanistan Supreme Court remanded the case because it "require[d] further and a thorough investigation[;]" the lower court "had not considered" GIRoA's claim regarding the deed; and GIRoA had not been given an "opportunity to prove [its] claims" as to the allegedly fraudulent deed. J.A. 1240. These open issues show that the 2018 Remand Decision was not a final decision. There was no reason for the Board to consider the 2018 Remand Decision as "realistically . . . the final and conclusive recognizable decision on who owned the Land" due to the overthrow of GIRoA. *Decision* at 17 n.16. Moreover, the 2021 Decision, which was decided after the 2018 Remand Decision, found in favor of the other party. *See* J.A. 1304–05. While we do not expect to get another final decision from the Afghan court system due to the fall of GIRoA, neither the Board nor the government on appeal cites precedent requiring us to consider the 2018 Remand Decision final. At oral argument, the government's counsel conceded that "the 2018 [Remand] Decision is not final" and that issue preclusion does not apply. Oral Arg. at 27:37–27:58, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23 -1523_07092024.mp3. In sum, the Board erred by giving the 2018 Remand Decision preclusive effect.

The Board further erred by resolving material factual issues at the summary judgment stage relating to the deed, tax documents, and water rights documents provided by the Lessors. The 2021 Decision shows the Land Court received information indicating that the Lessors possess a deed to the Land. J.A. 1303 (2021 Decision referring to "legal deed no. 367, dated December 2, 1932[,] issued by

Kulangar Court in Logar"). The Board found that "the Land deed's handwriting differs from the handwriting on prior and subsequent deeds, so the Land deed contains indicia of fraud." *Decision* at 19. In making this finding at summary judgment, the Board erred because determining whether the deed is fraudulent requires credibility determinations and weighing evidence, both of which are inappropriate during the consideration of a motion for summary judgment. *See, e.g.*, *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) ("Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment; rather, the evidence should be viewed in the light most favorable to the non-moving party." (citation omitted)); *Nyari v. Napolitano*, 562 F.3d 916, 922 (8th Cir. 2009) ("It is well established that courts should neither weigh evidence nor make credibility determinations when ruling on a motion for summary judgment."); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (explaining, in context of Fed. R. Civ. P. 56, that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").[8] And even if the Board is correct that the "taxes and water rights evidenced in [the documents provided by the Lessors] were insufficient to cover the Land," *Decision* at 19, that also raises material factual issues—namely, what, if any, property rights the Lessors have that are relevant to the Land and what, if any, portion of the Land those rights cover.

---

[8] While the Board is not bound by the Federal Rules of Civil Procedure, Rule 7(c)(2) of the Armed Services Board of Contract Appeals states that "the Board looks to Rule 56 of the Federal Rules of Civil Procedure for guidance" "[i]n deciding motions for summary judgment."

When examining the record in a light most favorable to the non-movant, we conclude that the Board erred in determining that "the documents fail to raise a genuine issue of material fact suggesting that [the Lessors] owned the Land." *Id.* at 19. The evidence in this case, including but not limited to the 2021 Decision and the deed, would allow a reasonable factfinder to conclude that the Lessors owned the Land.

B.

The Lessors argue that the Board erred in granting summary judgment to the U.S. government under the act of state doctrine. Appellants' Br. 46. The Lessors argue that the Board's conclusion that granting relief to the Lessors would impermissibly invalidate the Declarations was wrong for four separate reasons, *id.* at 46–47: (1) the Declarations were not official sovereign acts, *id.* at 47–52; (2) granting the Lessors relief would not invalidate the Declarations, *id.* at 52–55; (3) the policies underlying the act of state doctrine weigh against applying the act of state doctrine here, *id.* at 55–58; and (4) even if the act of state doctrine applied here, it does not bar all the Lessors' claims, *id.* at 58–60.

The U.S. government contends that the act of state doctrine forecloses the Lessors' claims because "[t]he case unquestionably turns on the validity of the position taken by GIRoA in relations between it and the United States." Appellee's Br. 25. The U.S. government further argues that the Lessors cannot establish ownership of the land without the Board invalidating GIRoA's assertion that the land was public land. *Id.* at 28. In the U.S. government's view, GIRoA acted in its sovereign capacity when issuing the Declarations, and the Declarations formally added an area to the Bilateral Security Agreement's list of agreed facilities and areas. *Id.* at 30. The U.S. government also argues that none of the policies underlying the act of state doctrine

weigh against applying the act of state doctrine in this case. *Id.* at 31.

"Under [the act of state] doctrine, the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders . . . ." *Republic of Austria v. Altmann,* 541 U.S. 677, 700 (2004); *see also* Restatement § 441. There is a factual predicate for the act of state doctrine to apply: the suit must "require[] the [c]ourt to declare invalid, and thus ineffective as 'a rule of decision for the courts of this country,' the official act of a foreign sovereign." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l,* 493 U.S. 400, 405 (1990) (quoting *Ricaud v. Am. Metal Co.,* 246 U.S. 304, 310 (1918)) (internal citation omitted).

In the Board's act of state doctrine analysis, *see Decision* at 19–25, the Board refers to various portions of the 2017 and 2018 Declarations and seems to imply the Declarations, in their entirety, are the requisite "official act[s] of a foreign sovereign." *W.S. Kirkpatrick,* 493 U.S. at 405. But the mere issuance of the Declarations is not in itself an act to which the act of state doctrine applies. The Board relies on three potential sovereign acts in the Declarations: (1) GIRoA's statements regarding land ownership; (2) the purported waiver[9] of GIRoA's citizens' claims against the

---

[9] The Board referred to "GIRoA's official act of waiving its citizens' claims against the United States related to the Land." *Decision* at 21. Though the Board used the term "waive[r]," *id.*, the Board appeared to be referring to GIRoA's covenant to "take full responsibility of any and all land cla[i]ms made regarding ownership," J.A. 1221, and related statements in the Declarations. *See Decision* at 21. We do not decide here whether such covenants constitute a waiver of GIRoA's citizens' claims against the United States related to the Land. We merely use the term waiver

United States related to the Land; and (3) the expansion of the Bilateral Security Agreement to include Camp Dhalke and FOB Shank as an agreed facility. *See Decision* at 21, 19–20, 22–25. We conclude that the Board erred by determining at the summary judgment stage that any of these potential acts triggers the act of state doctrine.

First, the Declarations' statements of land ownership were not official sovereign acts to which the act of state doctrine applies. The act of state doctrine "is typically applied to tangible acts, like the expropriation of property." *PNC Fin. Servs. Grp., Inc. v. Comm'r*, 503 F.3d 119, 126 (D.C. Cir. 2007); *see also McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012). Here, the Board stated that "GIRoA has taken the official act within its territory of asserting its ownership of the Land." *Decision* at 20; *see also id.* at 21. But the Declarations do not take or expropriate the Land as an official act. *See* J.A. 1216, 1221–22. Instead, in the Declarations, GIRoA appears to have recognized that ownership was an ongoing controversy, as evidenced by GIRoA's "covenant[s]" and "promise[s]" to "take full responsibility of any and all land cla[i]ms made regarding ownership over" the Land. J.A. 1221; *see also* J.A. 1216 ("GIRoA *covenants* that it has the legal authority over the land necessary to effect this agreement and authorization." (emphasis added)). Such recognition of a controversy is not an official sovereign act that would need to be declared invalid for the Board to grant the Lessors' requested relief. Accordingly, the act of state doctrine does not apply to GIRoA's statements of land ownership in the Declarations.

Second, any waiver of the Lessors' claims by GIRoA via the Declarations is not the kind of sovereign act to which the act of state doctrine applies. *Decision* at 20–21. The

---

as a shorthand to refer to the Declarations' provisions identified by the Board.

act of state doctrine relates to recognizing the validity of a foreign sovereign's "official act" "performed within [the sovereign's] own territory." Restatement § 441. The Supreme Court has explained that "[i]n every case in which [the Court] ha[s] held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick*, 493 U.S. at 405. Here, GIRoA assumed responsibility for resolving in full "[a]ny and all claims made against the Camp Dhalke and FOB Shank land or regarding the ownership of this land." J.A. 1216; J.A. 1221–22. Neither the Board nor the government has identified any precedent applying the act of state doctrine in such a situation. The cases that the Board cites are distinguishable and instead relate to waiver provisions in treaties. *See Decision* at 21 (first citing *S.N.T. Fratelli Gondrand v. United States*, 166 Ct. Cl. 473, 478–79 (1964); and then citing *Pauly v. United States*, 152 Ct. Cl. 838, 844 (1961)). The parties have identified no such waiver provisions applicable to the facts before us.

Additionally, our sister circuit has explained that "[a]lthough the Supreme Court has not defined the contours of the 'official action' requirement of the act of state doctrine, the courts of appeals have understood the concept as referring to conduct that is by nature distinctly sovereign, i.e., conduct that cannot be undertaken by a private individual or entity." *McKesson*, 672 F.3d at 1073. GIRoA's assumption of responsibility in the Declarations is not a distinctly sovereign act—instead, it is the type of assumption of responsibility that individuals or entities can undertake in their private capacity. *See* J.A. 1216 ("Any and all claims made against the Camp Dhalke and FOB Shank land or regarding the ownership of this land are the responsibility of GIRoA and shall be resolved in full by GIRoA."); J.A. 1221–22 (similar). Accordingly, we conclude that any waiver of the Lessors' claims or assumption of

responsibility by GIRoA via the Declarations is not an official act for purposes of the act of state doctrine.

Third, we agree with the U.S. government that the Declarations' expansion of the Bilateral Security Agreement to include Camp Dahlke and FOB Shank as agreed facilities, J.A. 1216, is an official act of GIRoA.  Restatement § 441; *see* J.A. 1221 ("acknowledg[ing]" and "validat[ing]" the 2017 Declaration).  But that does not end our inquiry.  To prevail, the U.S. government must show that granting the Lessors' relief in this case would require the Board to declare invalid the Declarations' expansion of the Bilateral Security Agreement.  *See W.S. Kirkpatrick*, 493 U.S. at 405.  That is not the situation here.  The Board could determine that the U.S. government was required to pay rent for the period for which relief was requested without concluding any part of the Declarations is invalid.  Enforcing the U.S. government's obligation to pay rent for use of the Land would simply trigger GIRoA's promise to "accept[] full responsibility for any and all land claims that may arise over the use of [FOB Shank and Camp Dhalke]," as envisioned in the 2018 Declaration.  J.A. 1221; *see also* J.A. 1216.  Accordingly, granting the Lessors' requested relief would not require invalidating the Bilateral Security Agreement, the Declarations, or any other sovereign act. Here too, we conclude that granting the Lessors' relief would not violate the act of state doctrine.

Our conclusion that the act of state doctrine is not implicated by the facts of this case is further supported by the general principles underlying the doctrine.  *See W.S. Kirkpatrick*, 493 U.S. at 409 (indicating that in considering whether the doctrine should be invoked, the policies underlying the act of state doctrine may be considered).  GIRoA, the government which perpetrated the purported act of state, is no longer in existence.  Therefore, there is no risk of imperiling the relationship between the United States government and GIRoA, nor is there any concern about undue interference with GIRoA's acts.  *See, e.g.*, Restatement

§ 441 cmt. a (explaining the act of state doctrine reflects "considerations of international comity and a concern about undue interference with another sovereign's acts"). Any action of a tribunal in this country simply cannot interfere with GIRoA's acts going forward.

We conclude that the act of state doctrine does not bar the Lessors' request for relief. Accordingly, the Board erred in granting the government summary judgment under the act of state doctrine.[10]

### C.

The U.S. government raises two additional issues that it argues provide sufficient grounds for affirmance: (1) the purported lack of mutuality of intent to contract between the Lessors and the U.S. Army Corps of Engineers, Appellee's Br. 15–19, and (2) GIRoA's purported espousal and extinguishment of the Lessors' claims against the United States related to the Land. *Id.* at 35–38; *see also id.* at 21–23. The Board did not rely on either ground as a basis for its decision, however, and so *SEC v. Chenery Corp.* bars us from affirming on those grounds. 332 U.S. 194, 196 (1947).

"It is 'a simple but fundamental rule of administrative law' that reviewing courts 'must judge the propriety of [agency] action solely by the grounds invoked by the agency.'" *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (alteration in original) (quoting *Chenery*, 332 U.S. at 196). "[A]n agency's discretionary order [may] be upheld," in other words, only "on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United*

---

[10]    Because we conclude that the Board erred in finding that the act of state doctrine bars the Lessors' request for relief, we need not address the Lessors' fourth argument—that even if the act of state doctrine applied, it does not bar all the Lessors' claims. Appellants' Br. 58–60.

*States*, 371 U.S. 156, 169 (1962).  The Supreme Court has recognized an exception to *Chenery* in narrow circumstances "where '[t]here is not the slightest uncertainty as to the outcome' of the agency's proceedings on remand," *Calcutt*, 598 U.S. at 630 (alteration in original) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 n.6 (1969) (plurality opinion)), such as "[w]here the agency 'was *required*' to take a particular action." *Id.* (quoting *Morgan Stanley Capital Grp. Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 544–45 (2008)).

The U.S. government argues that the Lessors cannot establish mutual intent to contract after 2009 and that should conclude the appeal.  Appellee's Br. 15.  But the Board did not invoke that ground as a basis for its decision.  The Board's decision addressed mutuality of intent to contract only in the context of the land ownership dispute.  *See Decision* at 11.  The Board did not invoke the U.S. government's intent to contract, or anything about intent to contract post-2009, as the basis for any part of its decision.  Accordingly, we cannot affirm the Board's decision on that ground unless a *Chenery* exception applies.  *See Calcutt*, 598 U.S. at 630.  The U.S. government has not argued for the application of an exception, nor do we see one that is applicable.  Because the Board was not required to make any particular decision about the U.S. government's post-2009 intent to contract and the facts presented in this case do not meet the high bar of showing "there is not the slightest uncertainty as to the outcome of the agency's proceedings on remand," we conclude that the government's alternative ground for affirmance is barred by *Chenery*.  *Id.* (quoting *NLRB*, 394 U.S. at 767 n.6) (cleaned up).

We also cannot affirm the Board's judgment based on the government's newly raised espousal and extinguishment ground.  Espousal occurs when one sovereign "assert[s] the private claims of its nationals against another sovereign." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1523 (D.C. Cir. 1984).  "Once it has

espoused a claim, the sovereign has wide-ranging discretion in disposing of [the espoused claim]," including "waiv[ing] it entirely"—in other words, extinguishing the claim. *Id.* Here, the government argues that in the 2017 and 2018 Declarations, "GIRoA espoused the claims of [the Lessors] and extinguished them as against the United States" "[b]y 'accepting for resolution any such land claims filed against the United States.'" Appellee's Br. 37 (quoting J.A. 1221).

But the U.S. government's argument fails because the Board relied on the act of state doctrine, not espousal or extinguishment, as a ground for its decision. *See Decision* at 19–25. The parties agree espousal and extinguishment is an "independent defense" from the act of state doctrine. Appellee's Br. 36; *see also* Appellants' Reply Br. 26. The U.S. government relies on the Board's analysis relating to the Declarations' purported waiver provision, which "accept[s] for resolution any such land claims filed against the United States Government," J.A. 1221—but that analysis was only made relating to the act of state doctrine. *See Decision* at 21. In fact, the Board did not mention espousal in its decision, nor do the cases cited by the Board in its waiver provision analysis refer to espousal. *Id.* (first citing *S.N.T.*, 166 Ct. Cl. at 478–79; then citing *Pauly*, 152 Ct. Cl. at 844). The government also does not argue where it has raised the issue of espousal to the Board. No *Chenery* exception applies, and we are barred from affirming the Board's decision based on this belatedly raised ground. It is for the Board, not this court, to decide in the first instance whether there is espousal and extinguishment in this case.

Accordingly, we decline to address the merits of the U.S. government's arguments based on the alleged alternative grounds for affirmance.

## IV. CONCLUSION

We have considered the U.S. government's remaining arguments and find them unpersuasive. We vacate the Board's grant of summary judgment in the U.S. government's favor and remand to the Board for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

Costs awarded to the Lessors.