# United States Court of Appeals for the Federal Circuit

---

**ABDUL MUTAKABER,**
*Appellant*

**v.**

**SECRETARY OF STATE,**
*Appellee*

---

2024-1644

---

Appeal from the Civilian Board of Contract Appeals in No. 7576, Administrative Judge Marian Elizabeth Sullivan, Administrative Judge Allan H. Goodman, Administrative Judge Joseph A. Vergilio.

------------------------------------------------

**HAMIDULLAH, SON OF MOHAMMAD RAJAB,**
*Appellant*

**v.**

**SECRETARY OF STATE,**
*Appellee*

---

2024-1645

---

Appeal from the Civilian Board of Contract Appeals in Nos. 7502, 7503, Administrative Judge Marian Elizabeth Sullivan, Administrative Judge Allan H. Goodman, Administrative Judge Joseph A. Vergilio.

———————————

Decided:  December 18, 2025

———————————

ENAYAT QASIMI, Whiteford, Taylor & Preston, LLP, Washington, DC, argued for appellants.

WILLIAM PORTER RAYEL, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee.  Also represented by BRIAN M. BOYNTON, WILLIAM JAMES GRIMALDI, PATRICIA M. MCCARTHY; ERIN M. KRIYNOVICH, Office of the Legal Adviser for Buildings and Acquisitions, United States Department of State, Washington, DC.

———————————

Before CUNNINGHAM, LINN, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

Appellants Abdul Mutakaber and Hamidullah, son of Mohammad Rajab (together, "Appellants"), appeal from companion decisions of the United States Civilian Board of Contract Appeals ("Board").  *See Mutakaber v. Dep't of State*, CBCA 7576, 24-1 BCA ¶ 38,496 (2024); *Hamidullah v. Dep't of State*, CBCA 7502, 24-1 BCA ¶ 38,495 (2024).  As acknowledged by the parties, these cases involve the same operative facts, materially identical contracts, substantially similar legal arguments, and like treatment by the Board.  Hence, we address both cases together.  We affirm.

# I

## A

In August 2021, the United States military withdrew from Afghanistan as the Taliban was approaching the country's capital, Kabul.  As part of that withdrawal, the U.S. vacated its embassy and the surrounding buildings and surface lots it had used as part of its diplomatic mission.  Seven of these properties were leased by the U.S. government pursuant to a series of written agreements (the "Leases"), including five residential buildings owned by Appellant Mutakaber (the "Villas") and two military vehicle storage lots owned by Appellant Hamidullah (the "Lots," and, together with the Villas, hereinafter the "Properties"). These Leases form the basis of these appeals.

Each of the Leases was executed sometime between 2013 and 2020, a period during which Afghanistan was governed by the democratically-elected and U.S.-recognized Ghani administration.  In 2020, however, faced with a Taliban insurgency, the U.S. entered into an agreement with the Taliban known as the "Doha Agreement." M.J.A. 274-76; H.J.A. 392.[1]  Pursuant to the Doha Agreement, the U.S. agreed to withdraw from Afghanistan.

In August 2021, the U.S. evacuated its personnel from Kabul, ceased diplomatic operations, and substantially left Afghanistan.  In the ensuing vacuum, the Taliban took control of Kabul and precipitated the collapse of the Ghani government.  *See Lessors of Abchakan Vill. v. Sec'y of Def.*, 137 F.4th 1301, 1306 n.3 (Fed. Cir. 2025).  As part of its occupation of Kabul, the Taliban seized Appellants' Properties.

---

[1]    "M.J.A." refers to the *Mutakaber* record, M. ECF No. 22, while "H.J.A." refers to the *Hamidullah* record, H. ECF No. 22.

B

In 2013 and 2014, respectively, the government executed two leases with Hamidullah to rent what are called the Qasemi and Polaski Lots (respectively, the "Qasemi Lease" and the "Polaski Lease"). The Qasemi and Polaski Leases were in effect in 2021 during the events at issue here.

Similarly, between 2016 and 2020, the government contracted with Mutakaber to rent the five Villas – known as the Maryland, Guam, Champagne, Pennsylvania, and Connecticut Houses – pursuant to four leases (collectively, the "Mutakaber Leases"). Specifically, each of the Maryland, Guam, and Champagne Houses was the subject of an individual lease, while the Pennsylvania and Connecticut Houses were leased together under a single, joint agreement.[2] The Mutakaber Leases were all in effect during the relevant period.

On September 23, 2021, several weeks after the Taliban took control of Kabul, the government terminated the Mutakaber Leases by sending Mutakaber notice by email. Each termination notice invoked Article 12(A) of the Mutakaber Leases, which relates to force majeure, and purported to effect termination as of the next day, September 24, 2021. The government terminated the Qasemi and Polaski Leases in the same manner and on the same grounds on November 9, 2021, and March 3, 2022, respectively.

The government also requested refunds from both landlords for advance rental payments it had made under the Leases. From Mutakaber, the government demanded the return of $51,287.67, $86,991.78, and $276,657.53 under the Guam, Champagne, and PA+CT Leases,

---

[2]   In keeping with the parties' briefs, we refer herein to these as the "Maryland Lease," "Guam Lease," "Champagne Lease," and "PA+CT Lease," respectively.

respectively. From Hamidullah, the government sought $118,076 under the Polaski Lease.

After receiving the notices of termination, representatives of Mutakaber and Hamidullah tried to access the Properties. In October 2021, Mutakaber's property manager attempted to inspect the Villas. Upon arriving at the security gate, he discovered that the Taliban had taken possession of all five Villas. He was denied access by the Taliban that day and again on at least one subsequent occasion. In late 2022, Hamidullah had a similar experience. After obtaining the phone numbers for two Taliban military commanders he learned were in control of the Lots, he was told during several phone calls that the Taliban Special Forces and Ministry of Defense were using the Lots for various military purposes. As far as the record reveals, to date neither Appellant has been able to reclaim or occupy his property.

C

In 2022, pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 7101, *et seq*., Mutakaber and Hamidullah submitted certified claims to the State Department. In them, Appellants sought the alternative remedies of recovery of unpaid rent, restoration of physical possession of the Properties, or a purchase of the Properties by the government.

After their claims were denied by the contracting officer, Appellants appealed to the Board. The government counterclaimed for $384,306.84 against Mutakaber and for $118,076 against Hamidullah, seeking refunds of pre-paid rent. The parties filed cross-motions for summary judgment in both cases.

The Board denied Appellants' motions for summary judgment and granted the government's motions in part. In both cases, the Board found that, although the government did not successfully terminate the Leases pursuant to the force majeure clause contained in Article 12, it

nonetheless constructively terminated them for "convenience" under Article 14's "Termination" provision. M.J.A. 3, 6-8 ("[The government's] [t]erminations [w]ere [p]roper . . . [b]ecause [it] had the right to terminate the leases for convenience under [A]rticle 14."); H.J.A. 4, 6-8 (same). The Board also rejected Appellants' breach of contract claims based on its determination that the government had no duty to deliver physical possession of the Villas and Lots to Appellants following termination.

After the parties submitted additional information concerning the outstanding sums owed, the Board found that: (1) the government owed Mutakaber unpaid rent of $94,355.76 for the Maryland House, while (2) Mutakaber owed the government refunds of (a) $27,616.40 for the Guam House; (b) $73,182.93 for the Champagne House; and (c) $108,986.28 for the PA+CT House. With respect to Hamidullah, the Board found that: (1) the government owed Hamidullah unpaid rent for the Qasemi Lot of $254,669.80, and (2) Hamidullah owed the government a refund for pre-paid rent on the Polaski Lot of $61,399.65. In sum, the Board entered judgments against Mutakaber in the amount of $115,429.85 (plus interest) and for Hamidullah in the amount of $193,270.15 (plus interest).

Appellants timely appealed. The Board had jurisdiction pursuant to 41 U.S.C. § 7105(e)(1)(B). We have jurisdiction under 28 U.S.C. § 1295(a)(10).

II

"We review de novo the Board's conclusions of law, including grants of summary judgment, and the interpretation of a government contract." *Cooper/Ports Am., LLC v. Sec'y of Def.*, 959 F.3d 1373, 1377 (Fed. Cir. 2020) (internal quotation marks and citations omitted). "Contractual interpretation is a pure legal issue." *P.K. Mgmt. Grp., Inc. v. Sec'y of Hous. & Urb. Dev.*, 987 F.3d 1030, 1032 (Fed. Cir. 2021).

### III

Appellants argue that the Board erred in finding that the government did not breach the Leases. They insist that the Leases obligated the government to return physical possession of the Villas and Lots upon termination. In support of their position, Appellants rely on: (1) the express terms of the Leases; (2) the implied covenant of good faith and fair dealing; and (3) Afghan law. We address each ground in turn.

### A

"To recover for a breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020) (internal quotation marks omitted); *see also San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). The dispute here centers on the second element, the existence of a contractual duty.

### 1

Appellants first argue that the government breached Article 8(C), which, according to them, expressly imposes a duty on the government to physically return the leased Properties upon expiration or termination of the Leases. The plain and unambiguous language of that provision contains no such duty, however. *See NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1166 (Fed. Cir. 2021) ("In contract interpretation, the plain and unambiguous meaning of a written agreement controls.") (internal quotation marks omitted).

Article 8 provides, in full:[3]

ARTICLE EIGHT: TENANT RIGHTS AND RESPONSIBILITIES

A.  The TENANT shall have the right, during the existence of this Lease, to erect new structures, additions, and annexes, install utility infrastructure, post signs, make alterations, and attach fixtures in or upon the Premises. This includes the right to affix a flagstaff, a U.S. flag, a U.S. seal, and office signs and insignia on the Premises leased.

B.  Such fixtures, additions, annexes or structures placed in or upon or attached to the said Premises shall be and remain the property of the TENANT and may be removed before, at the time of, or within a reasonable time after the Lease or any extension thereof expires or is terminated at TENANT's discretion. TENANT may choose to leave the

---

[3]   The language of Article 8 varies slightly across the six Leases. At oral argument, Appellants' counsel argued that the version "most favorable" to Mutakaber's position is contained in the Champagne Lease. M. Oral Arg. at 13:50-14:55 (available at https://www.cafc.uscourts.gov/oral-arguments/24-1644_11072025.mp3); *see also* H. Oral Arg. at 2:15-30 (available at https://www.cafc.uscourts.gov/oral-arguments/24-1645_11072025.mp3). That provision is materially identical to Article 8 in the Polaski Lease, and therefore the strongest for Hamidullah as well. *Compare* M.J.A. 64-65, *with* H.J.A 88. Hence, we principally address Article 8 of the Champagne and Polaski Leases.

> improvements for the LANDLORD and there will be no requirement for the LANDLORD to pay any compensation.
>
> C.    The TENANT will not be responsible for restoring the Premises to any condition or for any changes or damages to the Premises.  The Premises are leased in 'as is' condition and *may be returned* in the 'as is' condition as of the date of lease expiry or termination.

M.J.A. 64-65 (emphasis added); H.J.A. 88 (same).

Appellants focus on the word "returned" in Article 8(C), asserting that it "necessarily connotes an obligation to actually return the Leased Premises at termination." M. Open. Br. at 14; *see also* H. Open. Br. at 15.  Relying on the well-settled principle that contracts are generally to be construed to avoid rendering any provision mere "surplusage," they reason that "[i]f the United States was free to abandon the Leased Premises to a hostile force upon lease termination, there would have been no need to address the obligation to restore the Leased Premises, nor any need to specify a condition in which the Leased Premises could be returned."  M. Open. Br. at 13, 16; *see also* H. Open. Br. at 13-14; *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

"Contract interpretation begins with the language of the written agreement." *NVT Techs.*, 370 F.3d at 1159; *see also C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.").  Here, the plain language of Article 8 does not address whether the government has an obligation to return physical possession of the Properties to Appellants upon

terminating the Leases for convenience.  Instead, as is clear from the last sentence of Article 8(C), the only reference to "return" in Article 8 pertains to the "condition" of the property at the time of return.  M.J.A. 65 ("The Premises are leased in 'as is' condition and may be returned in the 'as is' condition as of the date of lease expiry or termination."); H.J.A. 88 (same).  Indeed, Article 8 is entitled "Tenant Rights and Responsibilities" and governs the rights of the government, as tenant, to alter the Properties, such as by "erect[ing] new structures, additions, and annexes, install[ing] utility infrastructure, post[ing] signs, mak[ing] alterations, and attach[ing] fixtures in or upon the Premises."  M.J.A. 64; H.J.A. 88.  Notably, Article 8(C) does not even mention the word "termination," and its only reference to "return" is silent as to *when* or even *whether* the government must return the property.

No part of Article 8 imposes an obligation on the government to return the Properties upon termination, no matter the circumstances or whatever actions third parties might undertake.  Nor does Article 8 obligate the government to use any degree of effort to ensure Appellants' reentry of the Properties.  It does not, for instance, require the U.S. to take diplomatic or military action to return the Properties.[4]

Because Article 8 does not obligate the government to restore physical possession of the Properties to Appellants

---

[4]    Because we find that Article 8(C) of the Champagne and Polaski Leases does not contain an express obligation of physical return, we find that Appellants' reliance on the less favorable language of Article 8(A) of the Qasemi, Maryland, Guam, and PA+CT Leases is similarly unpersuasive.  Article 8(A) does not mention the word "return," and, like Article 8(C), simply concerns the tenant's right to make alterations.  *See* M.J.A. 36, 45-46, 54; H.J.A. 79.

under the Leases, we reject Appellants' argument that the government breached this provision.

2

Appellant Hamidullah also claims that Article 14(A) of the Qasemi Lease expressly requires physical return. That provision provides:

ARTICLE FOURTEEN: TERMINATION

A.  The TENANT may, for its convenience, terminate this Lease in whole or in part at any time, if it determines that such termination is in the best interests of the TENANT, by giving written notice to the LANDLORD 90 days in advance. If the TENANT terminates this Lease in accordance with this clause, the TENANT shall not be liable for any charges additional to those normally incurred up to the date the Lease is terminated. *The TENANT will return the property [in the condition] in which it was received minus normal wear and tear.* No unnecessary make-ready will be accomplished unless the damage[] is the result of negligence by the TENANT.

H.J.A. 80 (emphasis added).

Hamidullah's argument under Article 14 fails for the same reasons we have already considered with respect to Article 8. Namely, the provision's mention of "return" only addresses the condition of the premises upon return, not any duty or obligation with respect to whether, or how, physical possession might need to be restored. The language of this provision does not impose any express duty to return the Leased Premises upon termination of the Lease.

*See NOAA Maryland,* 997 F.3d at 1166; *see also NVT Techs.,* 370 F.3d at 1159.

3

Several provisions of the Leases further undermine Appellants' reading of the express language of Articles 8 and 14.

Article 8(B) of the Maryland, Guam, PA+CT, and Qasemi Leases sets out that the government shall not be responsible for "damage by the elements, or other circumstances not under the TENANT's control," including "[a]ny damage arising from the intentional acts or negligence of . . . third parties not under LANDLORD's or TENANT's control." M.J.A. 37, 46, 55; H.J.A. 79. Polaski Lease Article 7(E) similarly recites that "LANDLORD accepts full and sole responsibility for damage or injury sustained by TENANT or third parties." H.J.A. 88.

Article 11 of the Maryland, Guam, Champagne, PA+CT, and Polaski Leases, meanwhile, provides that "LANDLORD shall bear responsibility for all risk of loss of or damage to the Premises . . . arising from any causes whatsoever, other than TENANT fault." M.J.A. 37, 46, 55, 66; H.J.A. 89-90 (same).

Each of these provisions demonstrates that the parties expressly agreed to allocate to Appellants the risk of damage and injury to the Properties arising from third-party actions or events beyond the government's control or fault. *See generally Oman-Fischbach Int'l (JV) v. Pirie,* 276 F.3d 1380, 1385 (Fed. Cir. 2002) ("Unless the parties in unmistakable terms agreed to shift the risk of [the contract] due to acts by [a third-party] military, no liability on the part of the [U.S.] attaches from such acts."). The Taliban occupation of the Villas and Lots was a third-party action beyond the control of the government. As such, any damage caused by this event, including the inability of Appellants

to reoccupy the Properties, is to be borne by Appellants, not the government.

Accordingly, the express language of the Leases imposes no obligation on the government to physically return the Properties to Appellants.

B

In the alternative, Appellants contend that the Leases include an implied obligation of physical return. They base this argument on "the essential purpose of the Leases," as well as the implied covenant of good faith and fair dealing. M. Open. Br. at 18-19, 30; *see also* H. Open. Br. at 17-20, 27. We are not persuaded.

"The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). "The duty applies to the government just as it does to private parties," and obligates the government "not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* However, the implied covenant "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010); *see also BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016 (Fed. Cir. 2020) ("[A counterparty] cannot use the doctrine of good faith and fair dealing to complain of the very conduct that the contract expressly permits.").

Here, as we have already explained, the express language of the Leases relieves the government of responsibility for damage or loss to the Properties caused by third parties, including the Taliban. Hence, to read into the Leases an implied agreement by the government to physically return the Properties, regardless of the intervening third-party occupation by the Taliban, would impose a

contractual duty on the government inconsistent with the Leases' provisions. This would be improper. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) ("[A]n act will not be found to violate the duty [of good faith and fair dealing] (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision.").

Our holding does not, as Appellants contend, defeat the "essential purpose" of the Leases or constructively transform rental agreements into sale contracts. *See, e.g.*, M. Open. Br. at 19; H. Open. Br. at 17. To be clear, our decision does not authorize the government to retain physical possession of the Properties. As the government concedes, it had a duty as a tenant to vacate the Properties once it terminated the Leases. *See Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1299 (Fed. Cir. 1986) ("We conclude that, due to [the] definite term of the lease and the nature of the landlord-tenant relationship, an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary."). It is undisputed that the government has done so.

Therefore, we agree with the Board that the Leases contain no implied obligation for the government to physically return the Properties to Appellants upon termination.

## C

Finally, Appellants contend that Afghan law entitles them to the physical return of the Properties under the "Choice of Law" provision contained in the Leases. Article 16 of each Lease states (with immaterial variation): "The terms of this Lease shall be construed in accordance with the local laws of Afghanistan." M.J.A. 40, 49, 58, 70; H.J.A. 82, 94. According to Appellants, Articles 1375-77 of the

Afghan Civil Code mandate physical return.  Once again, we disagree with Appellants.

The sections of the Afghan Civil Code on which Appellants rely do not expressly address the circumstances presented here, where the government terminated the Leases and vacated the Properties, and a third party subsequently occupied the Properties before the landlord attempted to retake physical possession.  Instead, Articles 1375 and 1377 pertain to situations in which the "lessee keeps [the property] with himself" or "keeps the [leased] property without legal cause."  M.J.A. 1951-52; H.J.A. 1523-24 (Article 1375: "*If [lessee] keeps the mentioned property* without legal cause, he shall be bound to pay lessor.") (emphasis added), (Article 1377: "*If lessee keeps [the property] with himself* despite claim of return, he shall be liable for its destruction.") (emphasis added).  As Article 1376 of the Afghan Civil Code provides, the lessee's "obligat[ion] to return the leased property" is excused in cases of "destruction or defect in which lessee is not involved."  M.J.A. 1952; H.J.A. 1524.  That is essentially what occurred here.

Appellants' argument that the government violated the Afghan Civil Code, thus, is unavailing.[5]

## IV

We have considered Appellants' remaining arguments and find them unpersuasive. Accordingly, we affirm the Board's judgments.

## AFFIRMED

### COSTS

No costs.

---

[5]    This is assuming, without deciding, that Appellants' claims under the Afghan Civil Code are enforceable at the Board.